The PEOPLE of the State of Colorado, Complainant,

v.

Eugene A. STEINMAN, Attorney–Respondent.

No. 96SA157.

Supreme Court of Colorado, En Banc.

Jan. 13, 1997.

Linda Donnelly, Disciplinary Counsel, and James S. Sudler, Assistant Disciplinary Counsel, Denver, for Complainant.

No appearance by Attorney–Respondent.

PER CURIAM.

The hearing board in this lawyer discipline case recommended that the respondent be disbarred and be required to make certain restitution before readmission. A hearing panel of the supreme court grievance committee approved the board's findings and recommendations. The respondent failed to participate in the proceedings before the hearing board and he has not appeared in this court. We accept the hearing panel's recommendations.

I.

The respondent was admitted to practice law in Colorado in 1952. He was immediately suspended from the practice of law pursuant to C.R.C.P. 241.8, effective October 26, 1995. This case involves three formal complaints filed against the respondent. The respondent defaulted in all three cases and the allegations of fact contained in the complaints were deemed admitted. C.R.C.P. 241.13(b); *People v. Barr*, 855 P.2d 1386, 1386 (Colo.1993). Based on the respondent's defaults and the evidence presented by the complainant, the board made the following findings.

a.

In March 1994, the respondent moved from California to Colorado. At the time he moved, he had about twenty to thirty active clients in California. One of these clients was Deborah Gomez, who hired the respondent in January 1994 to file a personal bankruptcy for her and her husband. She signed a fee agreement with the respondent to pay $500 attorney fees and $160 for costs. Gomez paid the respondent $50 on January 31 and $410 on March 12, 1994. When she tried to contact him, she learned that the respondent had moved to Colorado.

Gomez contacted an investigator to track the respondent down, and in May 1994 Gomez located him. The respondent told her

---

that he would send her papers and a refund to her, but he did not do so. On July 16, 1994, she received her papers but no refund. After she filed a request for investigation with the Office of Disciplinary Counsel, she received a cashier's check from the respondent for $410, purchased on August 2, 1994.

### b.

In August 1991, Kathy Billec answered a newspaper advertisement for the respondent's services in Antioch, California, where she lives. The ad stated that the respondent made house calls and Billec made an appointment.

On August 6, 1991, the respondent's wife, Patricia Steinman, went to Billec's house, took information from her, and accepted a $520 check from Billec for attorney fees and costs associated with filing a Chapter 7 bankruptcy. Patricia Steinman is not a lawyer.

The respondent took no action on Billec's behalf, and she could not obtain any information about her case other than suggestions to "call next week." She therefore filed a complaint with the Better Business Bureau in January 1992. On January 30, 1992, the respondent filed Billec's bankruptcy petition and the case proceeded to discharge.

### c.

Nancy Peterson responded to the respondent's advertisement in the Contra Costa, California, newspaper for legal assistance in filing a bankruptcy petition and in dealing with her homeowner's association.

The respondent's wife went to Peterson's home on July 15, 1993, and interviewed Peterson. Peterson signed a fee agreement for a $500 legal fee and $150 for costs. Peterson paid $250 at that time.

On September 3, 1993, Peterson received a thirty-day notice of termination from her homeowner's association. Her efforts to contact the respondent were unsuccessful. She sent the respondent a check for $400 on October 1, 1993, and asked him to advise her of the filing date. Four days later, the respondent's wife returned to Peterson's home with pleadings for Peterson to sign.

The respondent also told Peterson that he would call her creditors and tell them not to contact her, but he did not do so. Peterson received a notice from the homeowner's association regarding her continued occupancy of the unit. The respondent agreed to appear with her before the board, but on the day of the meeting, he told Peterson that he was unable to attend. The respondent was in Colorado planning to relocate here. When Peterson appeared before the board she promised to sell her unit and she received an extension until March 31, 1994, to continue to occupy the unit.

The respondent moved to Colorado in March 1994 without notifying Peterson and without filing her bankruptcy case. She could not reach the respondent, and in April his telephone service was terminated.

### d.

On December 7, 1993, in response to an inquiry from Marina C. Papolla, the respondent's wife went to Pappolla's house to obtain information about filing a Chapter 7 bankruptcy for her. Pappolla signed a fee agreement, paying the respondent's wife $250 as a deposit against the total fee of $660 which included costs. On January 22, 1994, Pappolla sent the respondent checks totalling $410.

The respondent failed to file the bankruptcy petition, did not contact his client's creditors, failed to communicate appropriately with her about the status of the case, did not respond to Pappolla's requests for a refund, and did not notify her that he was relocating to Colorado.

### e.

Jacqueline Enriquez, who is now known as Jacqueline Bowdry, retained the respondent in October 1994 to file a personal bankruptcy for her. She was interviewed by the respondent's wife, who accepted $670 from Bowdry for attorney fees and costs. The respondent's wife instructed Bowdry to pay no bills. The respondent did not deposit the advance fee into a properly established and maintained trust account.

As a result of the respondent's wife's advice not to pay her bills, Bowdry did not pay

the second half of a traffic fine, and a warrant was issued for her arrest. Bowdry called the respondent, and he told her that his wife's advice was incorrect and that she should pay her fine.

On October 25, 1994, Bowdry appeared in Denver County Court in a collection matter in which a writ of garnishment had been initiated against her employer. She told opposing counsel that she had hired a lawyer to file a bankruptcy petition and the matter was continued. Based on the respondent's repeated representations that he would file the bankruptcy soon, and Bowdry's statements to the county court in reliance thereon, the collections matter was continued to February 7, 1995. On February 6, Bowdry entered into a payment schedule with her creditor's lawyer.

The respondent never filed the bankruptcy petition. In his response to the request for investigation filed against him by Bowdry with the Office of Disciplinary Counsel, the respondent offered to refund Bowdry's money, but has not done so.

### f.

In February 1995, William Hawkins saw the respondent's advertisement offering home visits for bankruptcy services. He called the number listed and made an appointment with the respondent's wife. She came to Hawkins's residence on February 9, reviewed his bills, determined that a Chapter 7 bankruptcy should be filed, and she collected a $650 fee plus $160 for costs. The respondent never filed the Hawkins bankruptcy. The respondent took Hawkins's money, then neglected to take any action on his behalf, and he aided his wife, a non-lawyer, in the unauthorized practice of law. By retaining Hawkins's money without performing any services for him, the respondent engaged in dishonesty, fraud, deceit, and misrepresentation.

### g.

Melissa Pena hired the respondent to represent her in a bankruptcy matter on about November 4, 1994. She paid him $100 and signed a fee agreement requiring her to pay the remainder of the respondent's $1,000 fee through a Chapter 13 bankruptcy plan. When she retained the respondent, Pena's main goal was to save her house which was in foreclosure. She paid the respondent's wife the filing fee on November 7, 1994, and signed a Chapter 13 petition and plan.

The respondent and his client appeared in court on November 8 and the respondent advised her to keep one automobile and give up another, an arrangement that was different from the Chapter 13 plan. He told Pena not to make the scheduled $240 monthly payments to the Trustee until he prepared and filed an amended plan.

In early January 1993, the Trustee filed a motion to dismiss the bankruptcy based on the respondent's failure to file a timely motion to confirm the plan. When the respondent appeared at the hearing on the motion to dismiss on January 30, he still had not filed an amended plan or a motion to confirm the original Chapter 13 plan. At that hearing, the respondent agreed on behalf of Pena that she would cure a default in the payments under the Chapter 13 plan and would begin making regular payments. He also agreed with the Trustee to file the motion to confirm within ten days. Pena did not begin her regular payments because the respondent continued to advise her he would file a new plan. He never filed the new plan, however, and as a result the bankruptcy was dismissed on March 24, 1995. When Pena learned the bankruptcy had been dismissed the respondent assured her that he would get it reinstated.

On February 23, 1995, Pena's mortgage lender filed for relief from the stay in order to foreclose on her house. The respondent did not file a response and his client lost her home through foreclosure. She and her three children moved in with her mother.

In April 1995, the respondent filed a motion to reinstate Pena's bankruptcy. The case was reinstated on the condition that Pena be current on her payments by May 12, 1995. The court suggested that Pena consider hiring another lawyer. On May 22, 1995, the Trustee filed another motion to dismiss based on the respondents's failure to file a motion to confirm. Pena tried to communi-

cate with the respondent, without success. Her case was dismissed on July 24, 1995.

#### h.

Steven M. McCord answered an advertisement for the respondent's services and made an appointment with the respondent's wife for March 15, 1995. When they met, Ms. Steinman told McCord that, although her husband would go to court with him, it would be cheaper for him to deal just with her and she would give the respondent the relevant information.

The respondent's non-lawyer wife also told McCord that a Chapter 7 bankruptcy would be appropriate for him and that it could "wipe out" all of his bills. McCord paid $500 for the respondent's services and $160 for the filing fee by March 20, 1995.

McCord's creditors continued to call and write him and he told them that he had filed for bankruptcy. One of his creditors informed him in July 1995 that no bankruptcy had been filed. When McCord tried to communicate with the respondent, he found the respondent's office vacant and for rent, and he could not obtain a forwarding address.

#### i.

The respondent had twenty to thirty active clients in California when he moved to Colorado in March 1994. He opened a trust account at a bank in Denver, but he used this so-called trust account as a business account. He commingled his personal funds with those belonging to his clients. He also failed to safeguard the funds his clients gave him for the purpose of paying bankruptcy filing fees and costs. The hearing board found that the respondent converted such funds and fees to his own use.

#### II.

The nature of the respondent's misfeasance was consistent throughout the above charges and the hearing board determined that his course of conduct violated the following disciplinary rules: R.P.C. 1.2(a) (a lawyer shall abide by a client's decisions concerning the objectives of representation); R.P.C. 1.3 (a lawyer shall not neglect a legal matter entrusted to that lawyer); R.P.C. 1.4(a) (a lawyer shall keep a client reasonably informed about the status of a matter); R.P.C. 1.15(a) (a lawyer shall hold property of clients or third persons that is in a lawyer's possession separate from the lawyer's own property); R.P.C. 1.16(d) (upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as refunding any advance payment of fee that has not been earned); R.P.C. 5.5(b) (a lawyer shall not assist a non-lawyer in the unauthorized practice of law); R.P.C. 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation); R.P.C. 8.4(h) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law).

#### III.

The hearing panel approved the board's recommendation that the respondent be disbarred and be required to make certain restitution. The respondent accepted advance fees and costs from clients in California and Colorado, performed little or no services on their behalf, and kept their money. He thereby abandoned multiple clients and misappropriated the clients' funds. The hearing board specifically found that the respondent caused serious harm to most of the clients mentioned above.

When a lawyer accepts fees from clients and then abandons those clients while keeping their money and causing serious harm, disbarment is appropriate. We disbarred the lawyer in *People v. Jenks,* 910 P.2d 688, 692 (Colo.1996), because he "accepted fees from a number of clients, then abandoned them, causing some of his clients substantial harm." The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (ABA *Standards* ) provides that, in the absence of mitigating factors, disbarment is generally appropriate when:

> (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or

(b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or

(c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

ABA *Standards* 4.41. *See, e.g., People v. Jamrozek,* 914 P.2d 350, 354 (Colo.1996) (lawyer who accepted fees from number of clients, then abandoned them, causing clients substantial harm disbarred); *People v. Tucker,* 904 P.2d 1321, 1325 (Colo.1995) (lawyer who abandoned her clients while continuing to collect attorney fees for work that would not be performed disbarred); *People v. Fritsche,* 897 P.2d 805, 806–07 (Colo.1995) (lawyer who effectively abandoned clients and disregarded disciplinary proceedings disbarred).

■ The respondent did not participate in the hearing before the board and presented no evidence of mitigation. The board found the following aggravating factors to be present: a dishonest or selfish motive, *ABA Standards* 9.22(b); a pattern of misconduct, *id.* at 9.22(c); multiple offenses, *id.* at 9.22(d); refusal to acknowledge wrongful nature of conduct, *id.* at 9.22(g); substantial experience in the practice of law, *id.* at 9.22(i); and indifference to making restitution, *id.* at 9.22(j). The only mitigating factor found was the absence of previous discipline. *Id.* at 9.32(a). By itself, this factor is insufficient to justify a sanction less than disbarment. *Jamrozek,* 914 P.2d at 354. Accordingly, we accept the hearing panel's recommendation that the respondent be disbarred. We also accept the recommendation that certain restitution be ordered, and we impose the restitution as a condition of readmission.

IV.

It is hereby ordered that Eugene A. Steinman be disbarred and that his name be stricken from the list of attorneys authorized to practice before this court, effective immediately. It is further ordered that prior to any application for readmission, the respondent make the following restitution:

(1) $250 plus statutory interest from March 12, 1994, to Deborah Gomez;

(2) $650 plus statutory interest from October 1, 1993, to Nancy Peterson;

(3) $660 plus statutory interest from January 22, 1994, to Marina C. Pappolla;

(4) $670 plus statutory interest from October 31, 1994, to Jacqueline Bowdry;

(5) $810 plus statutory interest from February 9, 1995, to William Hawkins; and

(6) $660 plus statutory interest from March 20, 1995, to Steven M. McCord.

In addition, the respondent must demonstrate as a condition for readmission that he has made restitution in full, including statutory interest, to Melissa Pena.

It is further ordered that the respondent pay the costs of this proceedings in the amount of $1,446.20 within ninety days of the date of this opinion to the Supreme Court Grievance Committee, 600–17th Street, Suite 920–S, Denver, Colorado 80202.