The PEOPLE of the State of
Colorado, Complainant,

v.

Larry W. SCHMEISER, Respondent.

No. 01PDJ002.

Office of the Presiding Disciplinary Judge
of the Supreme Court of Colorado.

July 27, 2001.

Opinion by Presiding Disciplinary Judge
ROGER L. KEITHLEY and Hearing Board
members, RICHARD P. HOLME and
WILLIAM R. GRAY, both members of the
bar.

## REPORT, DECISION AND IMPOSITION OF SANCTION

*SANCTION IMPOSED:* **ATTORNEY DIS-BARRED**

A sanctions hearing pursuant to C.R.C.P. 251.15 was held on July 12, 2001, before the Presiding Disciplinary Judge ("PDJ") and two hearing board members, Richard P. Holme and William R. Gray, both members of the bar. Terry Bernuth, Assistant Attorney Regulation Counsel represented the People of the State of Colorado (the "People"). Larry W. Schmeiser ("Schmeiser"), the respondent, did not appear either in person or by counsel.[1]

The Complaint in this action was filed January 25, 2001. Schmeiser did not file an Answer to the Complaint. On March 12, 2001 the People filed a Motion for Default. Schmeiser did not respond. On April 12, 2001 the PDJ issued an Order granting default, stating that all factual allegations set forth in the Complaint were deemed admitted pursuant to C.R.C.P. 251.15(b). The default Order also established that all violations

---

1. Schmeiser was also immediately suspended on January 26, 2001, as a result of the conduct which forms the basis of the claim I charges in this matter.

of The Rules of Professional Conduct ("Colo. RPC") alleged in the Complaint were also deemed admitted. *E.g., People v. Richards*, 748 P.2d 341 (Colo.1987).

At the sanctions hearing, the People presented evidence from Roy T. Allison, Jr. Exhibits 1 through 9 were offered by the People and admitted into evidence. The PDJ and Hearing Board considered the People's argument, the facts established by the entry of default, the exhibits admitted, assessed the testimony and credibility of the witness and made the following findings of fact which were established by clear and convincing evidence:

## I. FINDINGS OF FACT

Schmeiser has taken and subscribed to the oath of admission, was admitted to the bar of the Supreme Court on May 25, 1983 and is registered upon the official records of this court, registration number 12922. Schmeiser is subject to the jurisdiction of this court pursuant to C.R.C.P. 251.1(b).

All factual allegations set forth in the Complaint were deemed admitted by the entry of default. The facts set forth therein are therefore established by clear and convincing evidence. *See* Complaint attached hereto as exhibit 1. The Order entering default also granted default as to all alleged violations of The Rules of Professional Conduct set forth in the individual claims.

In claim I, the Allison matter, the facts established by the entry of default reveal that Schmeiser, in connection with his services to probate an estate, collected $25,000 from the sale of real estate belonging to the estate and deposited those funds into his trust account. Thereafter, over a period of nearly four years, without the authority of his client or the court, Schmeiser wrote more than twenty (20) checks to himself from that trust account totaling over $24,000 of the Allison funds. Schmeiser had no authority to disburse the estate funds to himself. As of the date of the sanction hearing and nearly eight years after Schmeiser received the sale proceeds on behalf of the estate, he has not disbursed those funds to the beneficiaries of the estate. Indeed, the estate remains open.

Beginning in 1995, the personal representative of the estate made efforts to contact Schmeiser to determine the status of the estate. Schmeiser's office telephone had been disconnected and he had vacated the office space where he first met the Allisons. Eventually, in 1997, a member of the Allison family was able to contact Schmeiser at his home. From 1997 through 1999, members of the Allison family had infrequent contacts with Schmeiser in which Schmeiser made various representations about his work on the estate and gave excuses for the delay. In October 2000, a letter was sent to Schmeiser informing him that his services were terminated. Since that time, Schmeiser has neither conveyed the estate funds nor returned the file to the Allisons.

The unauthorized manner in which Schmeiser withdrew the estate funds, the period of time over which Schmeiser retained possession and control of the estate funds combined with his failure to meaningfully communicate with the Allison family concerning any issue regarding the estate establishes that Schmeiser's conduct was knowing.

## II. CONCLUSIONS OF LAW

The entry of default established the following violations of The Colorado Rules of Professional Conduct: in claim I, the Allison matter, Colo. RPC 1.3 (neglect of a legal matter-abandonment), Colo. RPC 1.4(a)(failure to communicate), Colo. RPC 1.16(d)(upon termination, a lawyer shall take steps to protect a client's interests), and Colo. RPC 8.4(c)(conduct involving dishonesty-conversion); and in claim II, the Elliott matter, Colo. RPC. 1.3 (neglect).

The Supreme Court in *People v. Varallo*, 913 P.2d 1, 11 (Colo.1996), held:

Knowing misappropriation [for which the lawyer is almost invariably disbarred] "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *In re Noonan*, 102 N.J. 157, 160, 506 A.2d 722 (1986). Misappropriation includes "not only stealing, but also unauthorized temporary use for the lawyer's own

purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson,* 81 N.J. 451, 455 n. 1, 409 A.2d 1153 (1979).

■ The facts in this case demonstrate that Schmeiser knew that the funds he withdrew from his trust account belonged to the estate and that he was not authorized to distribute those funds to himself. Nothing more is required to conclude that Schmeiser engaged in knowing conversion of client funds.

■ Moreover, Schmeiser closed his office, allowed his telephone service to be terminated, failed to inform his client of those changes, failed to communicate with his client following the office closure and, when eventually found and contacted by his client, engaged in various acts designed to avoid disclosure of his misconduct while making no effort to complete the services for which he was engaged. Abandonment was defined in *People v. Carvell,* No. 99PDJ096 (Colo. PDJ September 11, 2000), 29 Colo. Law. 137 (November 2000), 2000 Colo. Discipl. LEXIS 26 as follows:

> To find abandonment rather than merely neglect, there must be proof that the attorney—during a given time period—was required to accomplish specific professional tasks for the client, failed to accomplish those tasks, and failed to communicate with the client. The proof must objectively indicate that the attorney has deserted, rejected and/or relinquished the professional responsibilities owed to the client.

Schmeiser's misconduct is neglect rising to the level of abandonment.

### III. SANCTION/IMPOSITION OF DISCIPLINE

■ The most serious misconduct engaged in by Schmeiser is the egregious pattern of dishonesty reflected in Schmeiser's writing of more than 20 checks made out to himself from his attorney trust account over a period extending from November 10, 1993, until October 1997, a period of almost four years, in the total amount of about $24,000. These misappropriated funds comprised virtually all of the moneys which had been deposited in Schmeiser's trust account in connection with the probate of the estate of Mr. Allison's father.

The ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards* ") is the guiding authority for selecting the appropriate sanction to impose for lawyer misconduct.

ABA *Standard* 4.11 provides:

> Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

ABA *Standard* 4.41(b) and (c) provide that disbarment is generally appropriate when:

> (b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or
>
> (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to the client.

The presumptive sanction of disbarment for conversion of client property applies whether there is injury to the client or only threatened injury. Here, the client lost some $24,000, undeniably a serious monetary injury.

The presumptive sanction recommended by ABA *Standards* 4.41 (disbarment) and 4.42 (suspension) are distinguished by the degree of injury or potential injury occasioned by the lawyer's misconduct. Serious injury as opposed to simple injury suggests disbarment rather than suspension. The PDJ and Hearing Board consider the injury which the client suffered in the Allison matter to constitute serious injury warranting disbarment under the ABA *Standards*.

There is no question in Colorado that conversion of clients' funds from an attorney's trust account for a lawyer's personal use and benefit without authorization warrants disbarment. *See, e.g., People v. Wallace,* 936 P.2d 1282, 1284 (Colo.1997); *Varallo,* 913 P.2d at 12. Although the amount of the conversion is not of significance, here it was indeed substantial and continuing over a number of years. Conversion of client funds combined with abandonment of a client also

almost invariably results in disbarment under Colorado law. *See Wallace,* 936 P.2d at 1284 (disbarring lawyer who abandoned clients, causing them serious harm, and knowingly misappropriated client funds); *People v. Townshend,* 933 P.2d 1327, 1329 (Colo.1997) (lawyer disbarred who effectively abandoned two clients after accepting retainers and failing to account for or return the unearned retainers); *People v. Gilbert,* 921 P.2d 48, (Colo.1996)(attorney disbarred for converting client funds in conjunction with abandonment of practice); *People v. Steinman,* 930 P.2d 596, 599–600 (Colo.1997)(lawyer disbarred who accepted fees from clients and then abandoned them while keeping their money and causing serious harm); *People v. Jenks,* 910 P.2d 688 (Colo.1996)(attorney disbarred for accepting legal fees from a number of clients and then abandoning them, causing some of the clients substantial harm); *People v. Tucker,* 904 P.2d 1321, 1325 (Colo.1995)(lawyer disbarred who abandoned clients while continuing to collect attorney fees for work that would not be performed); *People v. Fritsche,* 897 P.2d 805, 806–807 (Colo.1995)(lawyer who effectively abandoned clients and disregarded disciplinary proceedings disbarred); *People v. Elliott,* No. 99PDJ059 (consolidated with 99PDJ086) slip op. at 8 (Colo. PDJ March 1, 2000); 29 Colo. Law. 112, 113 (May 2000) 2000 Colo. Discipl. LEXIS 40 (attorney disbarred for abandoning his clients and conversion of clients' funds); *People v. Righter,* 35 P.3d 159, 163 (Colo. PDJ 1999), 28 COLO. LAW. 140, 141 (September, 1999)(attorney disbarred for, among other things, serious neglect of clients and conversion of client funds).

Determination of the appropriate sanction requires the PDJ and Hearing Board to consider aggravating and mitigating factors. Since Schmeiser did not participate in these proceedings, no mitigating factors were established. The facts deemed admitted in the Complaint establish several aggravating factors pursuant to ABA *Standard* 9.22. Schmeiser engaged in a pattern of miscon-

duct, *see id.* at 9.22(c); he engaged in multiple offenses, *see id,* at 9.22(d); at least one client—Allison—was vulnerable, *see id.* at 9.22(h); and he has made no effort to make restitution, *see id.* at 9.22(j). Moreover, Schmeiser has two prior instances of professional discipline, *see id.* at 9.22(a). In 1984, Schmeiser received a Letter of Admonition for threatening initiation and continuation of a criminal prosecution solely to gain advantage in a civil matter. On March 15, 2001, Schmeiser was suspended for one year and a day for neglect of and misrepresentations to clients in an unrelated case. *People v. Schmeiser,* 35 P.3d 560 (Colo. PDJ 2001), 30 Colo. Law. 125 (May 2001), 2001 Colo. Discipl. LEXIS 14.

## IV. ORDER

It is therefore ORDERED:

1. LARRY W. SCHMEISER, attorney registration number 12922 is disbarred from the practice of law effective thirty-one days from the date of this Order.

2. As a condition of reinstatement, Schmeiser must establish that he has refunded and paid restitution to Roy T. Allison, Jr., in the sum of $24,000 plus interest at the statutory rate from the date of this decision.[2]

3. Schmeiser is Ordered to pay the costs of these proceedings; the People shall submit a Statement of Costs within ten (10) days of the date of this Order. Respondent shall have five (5) days thereafter to submit a response thereto.

## EXHIBIT 1

SUPREME COURT, STATE OF COLORADO

ORIGINAL PROCEEDING IN DISCIPLINE

BEFORE THE PRESIDING DISCIPLINARY JUDGE

---

2. No evidence was introduced which would support an order of restitution in the Elliott matter

and, accordingly, no such order is entered.

Petitioner:

THE PEOPLE OF THE STATE OF COLO-RADO

Respondent:

LARRY W. SCHMEISER

TERRY BERNUTH, # 13146

Assistant Regulation Counsel

JOHN S. GLEASON, # 15011

Regulation Counsel

600   17 th Street, Suite 200–South

Denver, Colorado 80202

Telephone: (303) 893–8121, ext. 313

Attorney Reg. No. 13146

COURT USE ONLY

Case Number: 01PDJ002

### 1.  COMPLAINT

THIS COMPLAINT is filed pursuant to the authority of C.R.C.P. 251.9 through 251.14, and it is alleged as follows:

1. The respondent has taken and subscribed the oath of admission, was admitted to the bar of this court on May 25, 1983, and is registered upon the official records of this court, registration No. 12922.  He is subject to the jurisdiction of this court in these disciplinary proceedings.  The respondent's registered business address is 283 D Avenue, P.O. Box 1330, Limon, Colorado 80828 and his registered home address is RR2 21050 Road 197, Limon, Colorado 80828.

### *CLAIM I – ALLISON MATTER*

**(Colo. RPC 1.3, Colo. RPC 1.4(a), Colo. RPC 1.16(d) and Colo. RPC 8.4(c))**

2. In 1990, Jennifer Allison, the complaining witness, and her husband, Roy T. Allison, Jr. met with the respondent and hired him to probate the estate of Roy T. Allison, Sr. Roy T. Allison, Sr. was Ms. Allison's father-in-law and her husband's father.  Roy T. Allison, Sr. died intestate on February 4, 1990.

3. Respondent agreed to perform the legal services necessary to open and administer the estate, pay its creditors, prepare the necessary accountings, distribute the assets of the estate to the heirs, and close the estate.

4. In addition, the respondent told Mr. Allison that he would do what was necessary to get Mr. Allison appointed by the court as the personal representative of the estate.

5. The respondent told Mr. Allison that he would determine his fee for the legal services after the assets had been collected and accounted for and the estate was ready to be closed.

6. Mr. Allison gave the respondent two life insurance policies that were payable on the death of his father, one in the amount of $5,000, and the other in the amount of $500. Respondent collected and distributed the proceeds from the $5,000 policy but never distributed the proceeds from the $500 policy or accounted for them to the personal representative or the heirs, if he collected them.

7. At the time of his death, Mr. Allison, Sr. owned a home in Elbert County, Colorado. The home had no encumbrances against it. An appraisal of the property was done by K. Edward Kovitz on April 10, 1990 in preparation for the sale of the property by the personal representative.

8. On July 16, 1990, the respondent filed a petition for adjudication of intestacy, determination of heirs, and formal appointment of personal representative, a proposed order and an acceptance of appointment in the district court in Elbert County.  On July 18, 1990, the court entered an order of intestacy, and appointed Mr. Allison the personal representative.  Letters of administration were issued by the court.  Also on July 18, 1990, the respondent prepared an information of appointment which was filed on August 3, 1990.

9. A buyer was eventually located for the real estate property.  The respondent represented Mr. Allison, as the personal representative of the estate, in the real estate transaction and on October 8, 1993 a real estate closing on the property was held.

10. Mr. Allison did not authorize the respondent to pay himself for any fees out of the real estate funds.  Mr. Allison directed the respondent to collect the proceeds and maintain them in his trust account until a

later time when the assets would be distributed to the heirs.

11. Vera Sandstead, the buyer of the real estate property, was present at the closing as was the respondent with Mr. Allison in his capacity as the personal representative. At the closing, Mr. Allison executed a personal representative's deed and conveyed the real property to Vera E. Sandstead.

12. The purchaser presented the respondent with two checks in exchange for the property. One of the checks presented at closing was a cashier's check issued by Bank One and made payable to "Larry W. Schmeiser, Trust Account" in the amount of $6,500. The other check was issued by the Colorado Springs Production Credit Association and made payable to "Larry W. Schmeiser Trust Account" in the amount of $17,500.

13. Mrs. Sandstead had previously given the respondent a check made payable to Larry Schmeiser, in the amount of $1,000, as earnest money.

14. On October 8, 1993, after the closing, the respondent deposited the two checks into his trust account at the First National Bank of Limon. The checks were endorsed by the respondent. The deposit slip, prepared by the respondent, identified a net deposit of $24,000 from the two checks. The deposit was posted by the bank on October 12, 1993. After crediting the deposit on October 12, 1993, the respondent's trust account balance was $25,089.77.

15. The respondent paid three expenses of the estate from his trust account which totaled approximately $1,500 in October, 1993. However, the respondent did not pay the claim filed by the real estate appraiser, though the probate court file shows payment was requested numerous times.

16. The respondent's bank records, which the First National Bank of Limon produced pursuant to subpoena and notice of deposition, show that the respondent has not maintained the funds from the real estate closing in his trust account or his operating/personal account.

17. The banks records show that the respondent has converted the funds from the real estate closing for his personal use by writing numerous checks to himself over a lengthy period of time.

18. On November 10, 1993, December 6, 1993 and December 24, 1993, the respondent wrote checks from Allison funds in the trust account payable to himself personally in the amounts of $750, $500 and $1,000, respectively.

19. On or about January 31, 1994, Mr. Allison received in the mail a copy of the 1099–S IRS form declaring that $25,000, the gross proceeds received from the sale of the real property, was paid to the respondent.

20. On August 2, 1994, the respondent wrote a check from the Allison funds in the trust account to himself personally in the amount of $1,000.

21. In December 1994, in 1995, and on a regular basis in 1996 and 1997, the respondent wrote checks from Allison funds in the trust account payable to himself personally in the total amount of $18,800.

22. The respondent wrote checks to himself and for his own purpose totaling $20,550 at a minimum and used $1,656.82 more of the funds for matters other than the Allison matter.

23. The respondent has not distributed the funds from the real estate closing to the personal representative or any other heirs. The personal representative directed respondent to maintain the funds in the trust account with the exception that he was authorized to pay certain expenses of the estate. The respondent was not authorized by the personal representative to use those funds for any purpose other than payment of expenses of the estate. The respondent was not authorized by the personal representative or the court to use any of the funds belonging to the Estate of Roy T. Allison, Sr. for his own purposes.

24. After the closing, the Allisons had very little communication with the respondent. In approximately 1995, Ms. Allison called the respondent to inquire about the status of the estate. The respondent's office phone number was disconnected. The respondent no

longer occupied the office where he met with the Allisons. The respondent failed to notify Ms. Allison or the personal representative of any of these changes. Ms. Allison was able to determine that respondent still occupied a residence in Limon and she began to make telephone calls to him at his residence.

25. In 1997, Ms. Allison was able to talk to the respondent at home after many attempts to reach him. The respondent informed Ms. Allison that he had been sick and unable to complete the legal work that she had entrusted to him. The respondent represented to Ms. Allison that he would find the case file and finish the work on the estate, but that completion would be delayed for some short period of time because the file was in a box and he was not sure where it was.

26. In 1998, Ms. Allison repeatedly attempted to contact the respondent by telephone. She rarely was able to speak with the respondent. On one occasion when Ms. Allison was able to contact him, the respondent stated that he was too busy with taxes to complete the work on the estate. He further stated that he would finish the work after tax season and that he would contact her at a later time, which he never did.

27. In 1999, Ms. Allison repeatedly attempted to contact the respondent by telephone. She consistently got a busy signal. On one occasion when Ms. Allison was able to contact him, the respondent represented that he was in the middle of harvest and that he would contact her after harvest, which he never did.

28. In 2000, the Allisons wrote multiple letters to the respondent. In a letter dated January 27, 2000, Mr. Allison wrote, "We have tried for months to call, but always get a busy signal." The letter begged the respondent to call Mr. Allison and report on the status of the estate. The respondent failed to respond to the letter.

29. On June 1, 2000, Mr. Allison wrote another letter to the respondent and stated that he and Ms. Allison had made many attempts to reach him by telephone and to write to him, including the January letter, and still had not heard anything from him. The let-

ter urged the respondent to contact him and contained Mr. Allison's phone number and mailing address.

30. On October 3, 2000, Ms. Allison wrote another letter to the respondent terminating his representation of them and explicitly demanding the return of the real estate proceeds and the case file. The respondent never responded and never returned the case file or the real estate proceeds.

31. The respondent did not do the necessary accountings or other work he had agreed to do to close the estate. The estate remains open ten years after Mr. Allison, Sr.'s death.

32. The respondent's failure to properly administer the estate, pay its creditors, prepare accountings, distribute the assets of the estate, and close the estate constitutes neglect of the client's matter which was entrusted to the respondent and is a violation of Colo. RPC 1.3.

33. The respondent's failure to contact the personal representative over extended periods of time, his failure to inform the client of a new telephone number and address, his failure to return telephone calls, his failure to keep the client informed about the status of the estate, and to respond to three letters from the clients constitute separate violations of Colo. RPC 1.4(a).

34. The respondent's serious neglect of the client matter and failure to communicate with the client over an extended period of time, after many requests from the client, constitutes abandonment of the client. The client was abandoned by the respondent on October 3, 2000, if not before.

35. The respondent's failure to return the case file and the real estate proceeds to the personal representative, after the October 3, 2000 letter which demanded both from him, constitutes a violation of Colo. RPC 1.16(d).

36. The respondent's use of the real estate proceeds and the life insurance proceeds for personal use or unauthorized purposes constitutes conversion in violation of Colo. RPC 8.4(c).

### CLAIM II – ELLIOTT MATTER

#### (Colo. RPC 1.3)

37. In 1998, Donald Elliott hired the respondent to defend him against criminal charges of second-degree assault, menacing, and harassment-stalking. The respondent agreed to represent him in the criminal proceeding.

38. A jury trial of the charges against Elliott was scheduled for August 4, 1998 by the respondent and the district attorney.

39. On August 3, 1998, the day before the trial was to begin, the respondent met with Elliott and informed Elliott that he was not prepared for trial and that Elliott should fire him.

40. On August 4, 1998, the respondent and Elliott appeared in court for the scheduled trial. The respondent told the judge that he was not prepared for trial. Neither the judge nor the prosecutor was inclined to postpone the trial. The prosecutor offered to concede an issue if respondent would go forward with the trial that day.

41. With the concession, the respondent convinced Elliott that they would prevail at trial and that they should proceed despite the respondent's failure to prepare the case. In spite of the concession, Elliott was found guilty of harassment.

42. The respondent's failure to prepare for Elliott's trial, his failure to notify Elliott of his lack of preparation until the day before trial, and his decision to proceed without adequate preparation, constitute neglect of a client's matter in violation of Colo. RPC 1.3.

WHEREFORE, it is prayed that the respondent be found in violation of the above referenced rules of conduct as stated in Claim I and Claim II which establish grounds for discipline as provided in C.R.C.P. 251.5 and C.R.C.P. 241.6, and the Colorado Rules of Professional Conduct and that he be appropriately disciplined and assessed costs of these proceedings.