The PEOPLE of the State of
Colorado, Complainant,

v.

C. Gordon DICKINSON, Attorney–
Respondent.

No. 95SA259.

Supreme Court of Colorado,
En Banc.

Oct. 10, 1995.

Linda Donnelly, Disciplinary Counsel, John S. Gleason, Assistant Disciplinary Counsel, Denver, for Complainant.

Michael V. Makaroff, Denver, for Attorney–Respondent.

## PER CURIAM.

The respondent in this lawyer discipline proceeding was admitted to the practice of law in Colorado in 1967. The assistant disciplinary counsel and he entered into a stipulation, agreement and conditional admission of misconduct. C.R.C.P. 241.18. An inquiry panel of the supreme court grievance committee approved the conditional admission and recommended that the respondent be suspended from the practice of law for three years. We accept the conditional admission and the inquiry panel's recommendation. The parties stipulated to the following facts and disciplinary violations which are the subject of four separate formal complaints, Nos. GC 91A–81, GC 92A–26, GC 93A–106, and GC 94A–61.

## I.

### No. GC 91A–81

#### A.

■ The respondent represented Fred and Helen Schroetlin in a Chapter 12 bankruptcy proceeding. On November 12, 1988, the bankruptcy court approved the Schroetlins' reorganization plan. On March 8, 1990, however, the bankruptcy trustee filed a motion to dismiss based on the Schroetlins' failure to make timely payments under the plan.

The parties reached a stipulation in June 1990 which was approved by the court and provided that the Schroetlins pay the trustee $3,000 upon court approval, and $3,258.40 thirty days later. On June 7, 1990, the Schroetlins wrote a personal check for $6,258.40 to "G. [sic] Gordon Dickinson & Assoc. Trust Account." The check was not deposited in the respondent's trust account as it should have been, but was cashed and paid around June 15, 1990. Nevertheless, during July and August 1990, the respondent told the bankruptcy trustee that the funds were in his trust account and he would send them to the trustee. The respondent failed to send the funds, however.

The trustee demanded immediate payment on September 21, 1990. On October 5, 1990, the respondent wrote a check to the trustee for $6,258.40 drawn on the respondent's trust account. The bank dishonored the check on October 12 because of insufficient funds in the respondent's trust account. On October 29, 1990, the respondent delivered a certified check to the trustee's law office.

At no point did the Schroetlins give the respondent permission to use their funds for his personal or business use, nor were they aware of the respondent's delay in paying the trustee.

As he has admitted, the respondent's conduct violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(5) (a lawyer shall not engage in conduct prejudicial to the administration of justice); DR 1–102(A)(6) (a lawyer shall not engage in conduct that adversely reflects on the lawyer's fitness to practice law); and DR 9–102(A) (all funds of clients paid to the lawyer shall be deposited in one or more identifiable interest-bearing depository accounts maintained in the state in which the law office is located).

### B.

The bank records for the respondent's trust account reveal twenty-five insufficient fund checks between May and November 1990. Seven of the checks were presented two or three times. The respondent therefore again violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice).

### C.

The respondent deposited $12,900 into his trust account for his client George Allard, for the purpose of making an installment payment to Farm Credit Bank in July 1990. On the day of the deposit, May 21, 1990, the balance in the trust account was $12,950.64. Nine days later, however, the balance was $3.34 after the respondent wrote a check to himself for $6,000 and to others for the remainder.

Not surprisingly, when the respondent wrote a check for $12,000 on July 2, 1990, drawn on his trust account and payable to Allard and the Ninth Production Credit Association, the check was returned for insufficient funds. On July 10, 1990, the check was again presented for payment, and again it was returned for insufficient funds.

The respondent told Farm Credit's lawyer that he would deliver a cashier's check to him on July 16, 1990, but did not do so. Farm Credit's lawyer called and wrote to the respondent requesting payment on July 17 and July 26, 1990. The respondent ultimately delivered a cashier's check for $13,445.13 on August 4, 1990, covering interest and attorney fees. Allard was not aware that the respondent failed to pay Farm Credit on time.

The foregoing conduct violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); and DR 9–102(A) (failure to preserve the identity of funds and property of a client).

### D.

An insurance company wrote a check to the respondent's client, Gerald Poss, for $4,432.10. Poss endorsed the check on July 27, 1990, for the respondent to deposit the check in his trust account. On the same day, the respondent wrote Poss a trust account check for $3,332.10, representing Poss's share of the insurance check after deducting the respondent's fee.

On the day the trust account check was written, the account balance was $10,140.42. Three days later, July 30, 1990, the respondent wrote a $10,000 check on his trust account to his personal bank. Poss presented the trust account check for payment on July 30, and it was returned for insufficient funds. The check failed to clear a second time, so on August 17, 1990, the respondent wrote another check to Poss, which this time did clear.

As the respondent stipulated, the above conduct violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); DR 9–102(A) (failure to preserve the identity of funds and property of a client); and DR 9–102(B)(4) (a lawyer shall promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive).

### E.

On August 30, 1990, the respondent received and deposited in his trust account a check for $2,500 in settlement for his client, Consuelo Roney. The next day, the balance

in the trust account was only $345.19, after the respondent wrote a check for $3,776 for cash in order to obtain cashier's checks for a purpose unrelated to the settlement.

The respondent wrote a check for $2,205 to Roney on September 5, 1990, drawn on the trust account, and the check was returned for insufficient funds. The check cleared on second presentment. The respondent's conduct again violated DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); DR 9–102(A) (failure to preserve the identity of funds and property of a client); and DR 9–102(B)(4) (failure to promptly pay or deliver client funds as requested).

### F.

The respondent received a $5,000 check from his client, Robert Tiedgeon, on October 10, 1990, to be used for a property settlement. He deposited it in his trust account. On October 8, 1990, however, he had written a check for $5,288.20 to Tiedgeon's spouse's lawyer. This check was returned for insufficient funds because the balance in the respondent's trust account on October 9, 1990, when the check was presented, was $697.96. The respondent states that he expected to receive Tiedgeon's check before October 10, 1990, and he wrote the check to the other lawyer prior to receiving the funds.

The respondent's conduct violated DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); DR 9–102(A) (failure to preserve the identity of funds and property of a client).

### G.

The respondent failed to comply with the provisions of C.R.C.P. 265(II) with respect to the registration of himself as a professional corporation formed for the practice of law. He thereby also violated DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice).

### II.

### GC 92A–26

The respondent represented Pat Pelton in a post-dissolution matter. Pelton agreed with her former husband that he would pay her $11,000 in consideration for her dismissing her claim for his retirement funds. She therefore received a check for $11,000 on June 24, 1991, payable to her. The respondent told his client to endorse the check over to him, he would deposit it into his account, wait a few days for it to clear, deduct his attorney fees, and return the balance to her. The respondent did not, however, deposit the funds in his trust account, and he did not promptly pay her the amount she was entitled to.

On July 15, 1991, after repeated requests from Pelton, the respondent wrote her a check for $9,700.00, drawn on his operating account. This check was also returned for insufficient funds. Unfortunately, Pelton wrote a number of checks on her personal account before learning that the respondent's check bounced, so her bank froze her account. At the respondent's request, Pelton redeposited the respondent's check on July 22, 1991, but the bank again rejected the check for insufficient funds.

On July 29, 1991, the respondent wired $2,000 to Pelton's bank account. Pelton told the respondent that she would go to the police if he did not pay her the money he owed her. The respondent then deposited two checks payable to him from other clients for over $5,500 into Pelton's bank account. He paid Pelton the remaining balance plus an additional $300 restitution on July 30, 1991.

The foregoing conduct violated DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); DR 7–101(A)(3) (a lawyer shall not intentionally prejudice or damage the lawyer's client during the course of the professional relationship); DR 9–102(A) (failure to preserve the identity of client funds and property); and DR 9–102(B)(4) (failure to promptly pay or deliver client funds as requested).

## III.

### GC 93A–106

██ In April 1992, Gerald A. Sherman consulted with Sharon Day, a friend of one of the respondent's clients, about obtaining certain financing. Day asked for a $2,500 cash deposit, to be held in escrow, to assure payment of her costs. Andrew Jelonkiewicz, an acquaintance of Sherman, met with Day on April 20 to transfer the funds. The final escrow text states that the respondent is the "solicitor" for Day, and that Sherman's company had deposited with the respondent and Day $2,500.00, as good faith to be released upon written confirmation of conditions. The agreement also states that if the conditions were not satisfied within twenty business days, the funds would be returned. Both the respondent and Day signed the agreement on April 20, 1992.

The respondent deposited the escrow check into his *operating* account on April 21. He then wrote three checks from the account. He retained $150 for Day's expenses, and gave Day the remaining $2,350 in cash.

When negotiations between Sherman and Day were unsuccessful, Sherman called the respondent on May 1, 1992, and asked for a return of the $2,500. The respondent told Sherman that Day would return the funds, but when she did not, he reimbursed Sherman for the full amount.

The respondent thereby violated DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation); and DR 1–102(A)(6) (conduct adversely reflecting on fitness to practice); as well as C.R.C.P. 241.6(2) (any act or omission violating accepted rules or standards of legal ethics constitutes grounds for discipline); and C.R.C.P. 241.6(3) (misconduct involving any act or omission violating the highest standards of honesty, justice or morality is grounds for discipline).

## IV.

### GC 94A–61

#### A.

██ James and Emma Span hired the respondent in 1991 because of problems with their creditors, and the respondent filed a Chapter 12 bankruptcy on their behalf in March 1992. The Farmers Home Administration (FmHA) filed an objection on or about April 28, 1992, to the Spans' use of cash collateral in the operation of their farm. The respondent failed to file any response to the objection. On June 25, 1992, another creditor filed a motion for relief from the bankruptcy stay. The respondent again failed to file a response and the relief from stay was granted.

Under federal bankruptcy law, the Spans were required to file a reorganization plan within ninety days of the bankruptcy filing. The respondent requested an extension, which was granted and which extended the deadline for filing until July 7, 1992. The respondent filed the plan on July 28, 1992.

A bank filed a motion for relief from stay in August 1992 so it could proceed against collateral the bank held. The respondent did not file a response to the motion, although he was negotiating with the bank at the time the motion was filed.

In late September 1992, the respondent's paralegal called the Spans and suggested that they convert their Chapter 12 bankruptcy to a Chapter 7. The Spans disagreed with the conversion. On September 30, 1992, the respondent wrote to the Spans and urged them to go ahead with the conversion. He also told them that he had filed a motion to withdraw from the bankruptcy.

In the meantime, the Security Bank of Sidney, Nebraska, filed a motion to dismiss the bankruptcy. The Spans appeared at the scheduled hearing on October 5, 1992, with substitute counsel. The court noted at the hearing that the bankruptcy schedules were deficient, that there were no disclosures concerning the debtors' income of the prior year, and that there were no schedules concerning farm income and the debtors' expenses. The court also noted that on every pleading filed on the Spans' behalf, where reference was made to attached documents, no documents were attached.

The respondent has stipulated that he failed to discuss with the Spans his failures to respond to the motions for relief from stay, or whether the Spans could provide

adequate protection for the secured creditors. Moreover, he did not discuss the cash flow problem which would impede implementation of the plan, until late September 1992, even though the Spans had provided the respondent with income tax returns for the previous five years. Finally, the respondent did not file a statement of compensation paid or agreed to be paid within the preceding year concerning his legal fees, as required by federal law.

As the respondent has admitted, the above conduct violated DR 6–101(A)(2) (a lawyer shall not handle a legal matter entrusted to the lawyer without adequate preparation under the circumstances), and DR 6–101(A)(3) (a lawyer shall not neglect a legal matter entrusted to the lawyer).

### B.

The respondent represented Leroy and Cindy Henry in a Chapter 12 bankruptcy proceeding. The Henrys met with the respondent's paralegal several times in January 1992. They paid the respondent a $2,500 retainer, but they did not meet with him until June 4, 1992.

Nevertheless, the Henrys were billed for the following charges: (1) 3.5 hours at $125 per hour for a meeting on January 2, 1992, incorrectly reflecting that the Henrys met with the respondent rather than a paralegal; (2) a January 21, 1992, conference with the paralegal was incorrectly billed as three hours at $125 per hour with the respondent; (3) a March 2, 1992, conference with a bank representative was recorded and billed as a five hour charge with the respondent, who did not attend the meeting, although his paralegal did.

The total charges to the Henrys were $3,076.83, in addition to the $2,500 retainer. Although he billed the Henrys this amount, he did not submit a fee application as required by federal bankruptcy law, and the Henrys did not pay the additional $3,076.83.

On the day the bankruptcy was filed, March 25, 1992, the Henrys' account with the respondent showed a $522.55 credit balance, which then became the property of the estate. The respondent applied the credit balance to attorney fees incurred during February, March, and April 1992, without filing a fee application as required by federal law.

The Chapter 12 plan was supposed to be filed by June 25, 1992. On June 24, the respondent sent four of the ten pages of the plan to the Henrys with the request that they sign it. They refused. On June 26, 1992, the respondent asked for an extension until July 6, 1992. About July 22, 1992, the respondent faxed the complete plan to the Henrys, and they signed it and returned it to the respondent the next day. The respondent did not file the plan until August 10, 1992.

In October 1992, the respondent sent the Henrys an amended plan which showed a secured claim for Kirk State Bank of $64,-650.00. The amended plan reflected a payment schedule with a balloon payment of $58,832 at the end of seven years. The balloon payment should have been $56,376 and the Henrys objected to the amended plan. The amended plan contained signature lines for "James and Emma Span," not the Henrys. (See IV.A., above.) The Henrys had to then sign a blank signature with the understanding that the respondent would correct the balloon payment amount before submission.

The first amended plan submitted by the respondent on October 23, 1992, did not contain the corrected balloon payment. The signature lines had been changed to the Henrys' names, but were not executed. The bankruptcy trustee objected to the amended plan based on various omissions.

About December 1, 1992, the Henrys sold several offspring of mother cows (calves), and used the proceeds to pay the rental on their pasture and to purchase hay. The Henrys had been advised by the respondent that it was acceptable to do so, because the respondent believed that only the mother cows were collateral and the calves were not. According to the conditional admission, the calves were collateral of the Kirk State Bank, but, based on the respondent's advice, the Henrys did not ask the bank for permission to sell them.

Consequently, the bank asked the bankruptcy court to hold the Henrys in contempt for violation of an order for protection of collateral. The respondent told the Henrys that they did not have to attend their contempt hearing, scheduled for January 19, 1993, because he had written a letter that had resolved the matter. The Henrys, having become concerned with the respondent's advice, contacted another lawyer, and attended the contempt hearing with the new lawyer. Contrary to the respondent's representations, the bank matter had not been resolved, but it was resolved the day of the hearing.

The new lawyer urged the Henrys to review their bankruptcy court file. When they did, they discovered that the respondent had filed a *second* amended plan on or about December 1, 1992. The respondent filed this second amended plan, which was substantially similar to the first amended plan, without the Henrys' knowledge and without their signatures. The Henrys' new lawyer has since filed a third amended plan which has been confirmed.

The foregoing conduct violated DR 2–106(A) (a lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee), and DR 1–102(A)(4) (dishonesty, fraud, deceit, or misrepresentation) for filing the second amended plan without his clients' approval and for telling them that he had spoken with officials of the Kirk State Bank. The respondent also violated DR 1–102(A)(5) (conduct prejudicial to the administration of justice) by billing the Henrys and applying their credit balance to the respondent's fees without filing a fee application as required under federal bankruptcy law. Finally, the respondent's handling of the bankruptcy was negligent, contrary to DR 6–101(A)(3).

### V.

The inquiry panel approved the recommendation in the conditional admission that the respondent be suspended for three years. Our initial impression is to reject the conditional admission and send the matter back for further proceedings. Nevertheless, several factors have persuaded us to accept the conditional admission. Some members of the court would have rejected the conditional admission, however.

■ The joint factual stipulations of the respondent and the assistant disciplinary counsel contained in the verified conditional admission itself are entitled to the most weight in our decision. The unsworn factual assertions of the respondent's lawyer, on the other hand, submitted to the court in "Respondent's Analysis of Stipulation, Agreement and Conditional Admission of Misconduct," are not competent evidence and are given no weight insofar as they tend to defend or mitigate the respondent's misconduct.

■ The numerous admissions reflecting commingling of client funds, and the misappropriation of client funds, more than suggest that the respondent knowingly converted client funds. A lawyer's knowing conversion of client funds almost always merits disbarment even if the client funds are eventually replaced. *People v. Lefly*, 902 P.2d 361 (Colo.1995).

Because disbarment is the most severe sanction, however, it must be established by clear and convincing evidence that the misappropriation of client funds was knowing, and not merely negligent. *See People v. Galindo*, 884 P.2d 1109, 1112 (Colo.1994) (lawyer suspended rather than disbarred where it was not established that respondent's conversion of funds was knowing or intentional); *see also In re Barlow*, 140 N.J. 191, 657 A.2d 1197, 1200 (1995) (to disbar lawyer for misappropriation of client funds, supreme court must be able to conclude by clear and convincing evidence that misappropriation was knowing).

■ In this case, the assistant disciplinary counsel has essentially stipulated that it cannot be demonstrated by clear and convincing evidence that the respondent's misuse of client funds was knowing or intentional as opposed to negligent. Assuming this to be correct, we agree with the complainant that a long period of suspension, rather than disbarment, is acceptable. We also note that the respondent has one private censure in

twenty-eight years of practice. Accordingly, we accept the conditional admission and the inquiry panel's recommendation.

## VI.

It is hereby ordered that C. Gordon Dickinson be suspended from the practice of law for three years, effective thirty days after the issuance of this opinion. C.R.C.P. 241.21(a). It is further ordered that Dickinson pay the costs of this proceeding in the amount of $966.30 within thirty days after the announcement of this opinion to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 920–S, Denver, Colorado 80202. Dickinson shall not be reinstated until after he has complied with C.R.C.P. 241.22(b)–(d).