In The Matter of Mark Joseph FISCHER, Attorney–Respondent.

No. 03SA49.

Supreme Court of Colorado, En Banc.

May 10, 2004.

Kim E. Ikeler, Assistant Regulation Counsel, Denver, Colorado, Attorney for Petitioner.

Mark J. Fischer, Hayden, Colorado, Attorney for Attorney–Respondent.

Justice COATS delivered the Opinion of the Court.

Mark J. Fischer, the respondent in the underlying attorney discipline proceeding, appealed from the order of the Hearing Board disbarring him. *See People v. Fischer,* 63 P.3d 373 (Colo.O.P.D.J.2003). Fischer admitted that he violated the Rules of Professional Conduct by disbursing funds to his dissolution-of-marriage client, and to himself in the amount of his attorney fees, in a manner not in accordance with the terms of the separation agreement adopted by the court. The hearing Board held that disbarment was the presumed sanction for the respondent's misappropriation of funds and his violation of the court's order, and it found the mitigating circumstances offered by him insufficient to alter that sanction.

Because the Board did not appropriately consider and balance the aggravating and mitigating circumstances established as a matter of fact, and because it imposed an unreasonably harsh sanction on the respondent, we reverse its order of disbarment. Because we believe the proper application of the ABA Standards for Imposing Lawyer Sanctions leads to the conclusion that suspension, rather than disbarment, is the appropriate sanction, we now order the suspension of the respondent from the practice of law for a period of one year and one day.

## I.

In July 2002, the Office of Attorney Regulation filed a complaint against the respondent, alleging violations of Colo. RPC 8.4(c) ("Engaging In Conduct Involving Dishonesty, Fraud, Deceit, Or Misrepresentation"); 1.15(a) ("Failure To Hold Property Of Clients Or Third Parties Separate From Attorney's Own Property"); 1.15(a) ("Alternative Claim of Negligent or Technical Conversion"); 1.15(b) ("Failing To Deliver To Third Persons Funds That The Third Persons Are Entitled to Receive"); 1.15(c) ("Failing To Keep Disputed Property Separate Until There is An Accounting And Severance Of The Disputed Interest"); and 3.4(c) ("Knowing Disobedience Of An Obligation Under The Rules Of A Tribunal"). All of the allegations arose from the respondent's distribution of funds from the sale of marital assets to Ms. Fran McKinney, his client in a dissolution of marriage proceeding.

The respondent confessed all but the third claim, which alleged a negligent or technical conversion by allowing his trust account to dip below the amount of the sale proceeds, and all but that claim were resolved against him, either by judgment on the pleadings or summary judgment. The parties then filed an "Agreed Trial Management Order," which included a stipulated statement of facts and indicated that the third claim would be withdrawn. The trial management order further indicated the agreement of the parties that the only issue to be determined at trial would be the appropriate discipline and that, as a matter of law, the presumed discipline would be disbarment.

According to the stipulated statement of facts, in September 2001, Ms. McKinney and her husband, Mr. Gerald Hallman, entered into a Separation and Property Settlement Agreement, which was made an order of the court by its dissolution decree. The agreement called for Ms. McKinney to sell a piece of real property owned by the couple and a mobile home located on it. From the proceeds she agreed to pay certain enumerated debts, including three liens secured by the land, personal debts owed by her and Mr. Hallman, a $10,000 tax obligation, and $36,000 due on the purchase price of the

mobile home, as well as $10,000 to Mr. Hallman. Only after these payments were made did the agreement entitle Ms. McKinney to receive whatever proceeds remained from the sales. The agreement also provided for the payments to be made directly from the closing or from the proceeds deposited in the respondent's trust account.

As it turned out, Mr. Hallman had neglected to get permits related to the mobile home and had failed to register it with the county. A certificate of occupancy had therefore never been issued. Certain taxes had also never been paid, all of which made financing difficult, and Ms. McKinney had trouble selling the property. Ultimately, the respondent was able to arrange a sale of the real property (but not the mobile home), including payment of $70,000 of the purchase price in November 2001, to be followed in December with payment of $23,000, secured by a promissory note.

Neither Mr. Hallman nor his attorney attended the closings, but by correspondence with the respondent, Hallman's attorney confirmed her understanding that her client would receive his $10,000 from the proceeds of the sale held in the respondent's trust account. After the first closing, the respondent wrote to Hallman's attorney, indicating that the liens on the property had been paid from the $70,000 and that he had also paid certain of Ms. McKinney's personal debts, including his own claim of $4,000 for attorney fees. He indicated that the other debts his client was obliged to pay by the terms of the agreement would be handled when the additional $23,000 was paid but that he had been instructed by his client not to pay Mr. Hallman any money at that time, and perhaps not at all. As justification, he noted that Ms. McKinney had been forced to discount the property by at least $5,000 because of an inadequate and unapproved sewer system.

After not receiving any disbursement from the December payment of $23,000, Mr. Hallman filed a Motion for Release of Money Pursuant to the Settlement Agreement. The respondent's accounting, which he was ordered by the court to provide, indicated that Ms. McKinney had received a total of $53,108.30 and the respondent had received

an additional $6,468 as attorney fees. The $10,000 tax obligation had not been paid, and Mr. Hallman had not been paid the $10,000 required by the separation agreement. The respondent offered, as justification for refusing to pay Hallman, that his client had directed him as her attorney to withhold payment from her former husband because of the losses incurred due to his failure to disclose significant issues regarding the mobile home.

The district court found that the funds from the sale of the property were not disbursed in accordance with the agreement of the parties and order of the court, apparently for the reason that Ms. McKinney instructed the respondent to disburse funds contrary to the agreement. The court entered a provisional judgment in favor of Mr. Hallman and against Ms. McKinney for $47,083.82, which was vacated by stipulation of the parties after the respondent personally satisfied all of the financial terms and conditions outlined in the separation agreement. This satisfaction by the respondent included payments of $10,000 to Mr. Hallman, $3,794.97 to Hallman's attorney for additional attorney fees incurred by the respondent's actions, the respondent's personal assumption of the $36,000 debt on the unsold mobile home, payment of an additional $400 debt listed in the agreement, and payment of $3,596.48 to the Colorado Department of Revenue, fully resolving the "$10,000 tax obligation" referred to in the agreement.

In the stipulated statement of facts, the respondent also acknowledged that he should not have deviated from the disbursement schedule of the agreement without first seeking court approval, and that his actions had damaged Mr. Hallman both by delaying receipt of his $10,000 share of the equity in the land and by leaving him temporarily liable on the $10,000 tax obligation. Although the respondent also conceded that he should have seen his role as an officer of the court and should have followed the court's direction, as set out in its order, the respondent insisted that he did not think of himself, at the time, as a trustee executing a court order. He insisted that he saw himself as merely attempting to overcome the hurdles that arose

in liquidating the joint assets of the parties and fairly resolving their liabilities.

After a hearing, at which the respondent presented six witnesses (including the district court judge who presided over the dissolution agreement in question) in mitigation and as to his fitness to practice law, the Hearing Board nevertheless found disbarment to be the appropriate sanction. The Board relied heavily on its belief that a knowing conversion of a third party's funds entrusted to an attorney, as well as a knowing violation of a court order, with the intent to obtain a benefit and causing serious injury or potentially serious injury to a party, warrants disbarment. In aggravation the Board found that the respondent had a dishonest or selfish motive; had substantial experience in the practice of law; and had received a Letter of Admonition some 10 years earlier for neglect in representing an estate. The Board largely discounted the respondent's payment of restitution, on the grounds that the payments were made following the filing of a Request for Investigation and the threat of a lawsuit. Although the Board acknowledged the respondent's cooperation in the disciplinary proceedings; considerable evidence of his excellent reputation in his community; his pro bono activities and service on boards; his expression of remorse; and his practice in an area of the state in which few attorneys are available, the Board found these factors insufficient to overcome what it considered to be a presumption of disbarment.

The respondent appealed to this court, seeking review solely of the Board's order of disbarment.

II.

This court will affirm a sanction imposed by the Hearing Board unless it determines that the form of discipline bears no relation to the conduct, is manifestly excessive or insufficient in relation to the needs of the public, or is otherwise unreasonable. *See* C.R.C.P. 251.27(b); *In re Roose*, 69 P.3d 43, 46 (Colo.2003). In making these determinations, we have consistently recognized the ABA Standards for Imposing Lawyer Sanctions (1991 & Supp 1992) as the guiding

authority for selecting the appropriate sanction. *See In re Attorney D.*, 57 P.3d 395, 399 (Colo.2002). The purpose behind the creation of these Standards was to enhance consistency in the imposition of sanctions in attorney disciplinary proceedings. *See* ABA Standards, Preface. The Standards describe a range of available sanctions for each type of misconduct and require, in choosing the appropriate sanction, consideration not only of the duty that was violated, but also of the lawyer's mental state, the actual or potential injury caused by the lawyer's misconduct, and the existence of various aggravating or mitigating factors. ABA Standards 3.0; *Roose,* 69 P.3d at 47.

As the body actually entertaining evidence and evaluating witnesses, the Board's determinations of historical fact are entitled to deference by this court. C.R.C.P. 251.27(b); *Roose,* 69 P.3d at 46. Its decision to characterize particular facts as mitigation or aggravation and the weight it gives to each factor are, however, matters of law, or at least involve mixed questions of fact and law, which this court must ultimately decide for itself. C.R.C.P. 251.27(b); *In re Hickox,* 57 P.3d 403, 404 (Colo.2002). To the extent that our assessment of the factors involved in choosing an appropriate sanction, and our understanding of the ABA Standards and application of them to the established facts, leads us to the conclusion that the sanction imposed by the Board is manifestly excessive or insufficient in relation to the needs of the public, or is otherwise unreasonable, it is our obligation to disapprove that sanction.

### III.

Unlike most crimes defined by the legislature or at common law, violations of the Rules of Professional Conduct are not generally distinguished on the basis of particular culpable mental states or the seriousness of resulting harm. These factors are instead considered in determining an appropriate sanction. Similarly, while it is clearly important to permit, and in fact encourage, respondent-attorneys to recognize and acknowledge misconduct without depriving them of an opportunity to demonstrate why their misconduct requires less rather than more protec-

tion for the public, the hybrid, civil/criminal procedures of the rules governing attorney discipline do not provide any mechanism comparable to a guilty plea or providency hearing, to insure a common understanding of the scope and effect of a respondent's admissions.

The respondent's protestations in both the district court and this court are inconsistent with the admissions contained in his pleadings. It is perfectly clear, for instance, that despite admitting a "knowing" violation of a court order, and despite knowing, upon reflection, both that his actions were not in accord with the terms of the agreement and that the agreement had been incorporated by the dissolution decree, the respondent steadfastly asserted that it never dawned on him, while he was acting, that he was violating a court order.

■ It is unnecessary in this case, however, to decide the extent to which the respondent's admissions regarding violations of the Rules of Professional Conduct limited the Board from considering evidence of his mental state or the degree of any resulting injury in determining a sanction. Under the circumstances of his particular case, even if the respondent's conduct would have warranted disbarment in the absence of mitigation, sufficient facts in mitigation were established to make suspension, rather than disbarment, the appropriate sanction. Foremost among these were the respondent's recognition of his ethical violations and acceptance of responsibility for the injuries caused to others and the judicial system, evidenced by his cooperation with the Office of Attorney Regulation Counsel, his expressions of remorse, and his attempts to make whole the injured parties and clear up the problems caused by his behavior, at his own expense. *See* ABA Standard 9.32(a)-(m).

From the beginning, the respondent's transactions were undertaken in the open, without any attempt to falsify or conceal them. *See Id.* at 9.32(e) (full and free disclosure to disciplinary board or cooperative attitude toward proceeding considered a mitigating factor). When Hallman did not receive payment from the second closing and moved for distribution according to the terms of the

agreement, the court ordered an accounting and the respondent provided one, without subterfuge or delay. From the initial request of the OARC, the respondent met and spoke openly with the regulation counsel. When a complaint was filed, the respondent answered by admitting his conduct and seeking only to address the appropriateness of a sanction. In fact, the respondent's eagerness to admit his conduct, in light of the specificity with which the violations were pled, may well have impaired his ability to fully explain and mitigate the sanction.

Of considerable significance was the respondent's attempt to repair the damage his conduct had caused to his client's former husband, creditors of the couple, and the judicial system by accepting personal responsibility for all debts that were the subject of the separation agreement and any additional expenses. The ABA Standards for Imposing Lawyer Sanctions recognize a timely good faith effort to make restitution or rectify the consequences of misconduct as a mitigating factor. *See Id.* at 9.32(d). While acknowledging that some courts have held otherwise, the Standards consider it the better policy to allow a good faith effort to make restitution to be considered in mitigation in order both to encourage lawyers to reduce the injuries they have caused and help insure recognition of the wrongfulness of their conduct. *See In re Pautler,* 47 P.3d 1175, 1184 (Colo.2002). As the comments also make clear, it is the fact that restitution is made voluntarily and of the lawyer's own initiative that is important, even if that occurs in response to a complaint filed with the appropriate regulatory agency. Restitution prior to the initiation of disciplinary proceedings therefore present the clearest case for mitigation, while restitution later in the proceedings present a weaker case. *See* ABA Standard 9.32 cmt.

The Board discounted the respondent's personal assumption of the remaining debts as meriting little weight, solely on the grounds that they were made after the filing of a request for investigation and that they could become the subject of a lawsuit. Treating these threatened or potential actions as dispositive, the Board's order gives no indication of any further attempt to assess the respondent's bona fides. Although we have used similar, seemingly unequivocal language with regard to lawyers who knowingly spend, as if it were their own, money entrusted to them by their clients, this case clearly does not involve stealing a client's money. The dangers of encouraging subsequent claims that the lawyer intended merely to borrow the money and criticism that the wealthy are permitted to buy their way out of wrongdoing are not of the same concern under these circumstances. Moreover, the ABA Standards clearly recognize a distinction between repayment after being confronted with a complaint and repayment only when facing an inevitable order to do so. *Id.*

Here, the respondent did not treat funds entrusted to him by anyone, much less his client, as if they were his own; and apart from receiving payment for his attorney fees, he did not personally benefit from the distributions. He made no attempt to conceal his transactions from the court, and when admonished, he immediately acknowledged his ethical lapse and accepted responsibility. Before a complaint was ever filed, he had paid his client's former husband the $10,000 to which he would have been entitled from a sale of both the land and mobile home, as well as his additional attorney fees incurred in trying to collect this money. Before answering the complaint, once it was filed, he had accepted personal responsibility for all of the debts contemplated by the separation agreement, including the mobile home, which had proven to be unsaleable, and other family debts. Within weeks, a stipulation had been entered in the domestic proceeding, acknowledging that all payments required by the separation agreement had been made. In the absence of circumstances indicating otherwise, these actions by the respondent demonstrate precisely the recognition and acceptance of personal responsibility that diminish the need for further protection of the public.

Furthermore, as acknowledged by the Board, the respondent presented considerable evidence of other mitigation, including his excellent reputation in the profession, *see* ABA Standard 9.32(g) (character or reputation a factor in mitigation); his record of pro

bono and community service, *see In re Fong,* 308 A.D.2d 19, 762 N.Y.S.2d 367 (2003)(considerable evidence in mitigation, including attorney's regular pro bono work on behalf of four community organizations); *In re Mason,* 1997 WL 275107 (Cal.Bar Ct.1997)(attorney's pro bono work is a mitigating factor); *Disciplinary Action Against Dvorak,* 554 N.W.2d 399 (Minn.1996)(mitigating factors included substantial pro bono work and volunteer work provided to community by attorney); and the opinion of others, including the judge who presided over the dissolution proceeding, that he was not a risk to the public. *See* Standard 9.32(g). Although the Board found the 10–year–old Letter of Admonition for unrelated negligence to be an aggravating factor, the absence of any discipline, much less continuous or recent discipline, for dishonesty or violating court orders was actually a significant mitigating factor, *see* Standard 9.32(m) (remoteness of prior offenses is a mitigating factor); *People v. Pittam,* 889 P.2d 678 (Colo.1995) (previous suspension was seventeen years ago); *In re Boaten,* 276 Kan. 656, 78 P.3d 458 (2003) (finding that prior discipline occurring ten years ago "remote" in time), in terms of the risk the respondent posed to the public. Similarly, although the Board concluded, without elaboration or explanation, that the respondent had a dishonest or selfish motive, presumably because he received payment for his attorney fees, there was no suggestion in the record that he took any payment beyond that to which he would have been entitled; that he had any pressing need that would provide a motive for his untimely distribution to himself; or that his concern for the welfare of his aged client was feigned. To the extent that his desire to assist her could nevertheless be characterized as a dishonest motive, such a motive adds little aggravation under these circumstances.

All in all, by relying on authorities involving actual theft of client funds, the Board overemphasized the notion of a "presumption of disbarment" under these circumstances, and undervalued the importance of other factors in determining the needs of the public. Even "knowing conversions" of funds entrusted to attorneys do not always present the same need for sanctions. In one of the few recorded examples in this jurisdiction of disciplining an attorney for knowingly disbursing non-client funds entrusted to him other than in accordance with the terms of the trust, we considered it appropriate to suspend the offending attorney from the practice of law for a period of 60 days. *See People v. Nulan,* 820 P.2d 1117 (Colo.1991) (intentionally misapplying escrowed earnest money by distributing portions to himself, his step-brother, and creditors of the subject restaurant under pressure from family members).

## IV.

Because we have determined that the Board did not appropriately consider and balance the aggravating and mitigating circumstances established as a matter of fact, and that it imposed an unreasonably harsh sanction on the respondent, we reverse its order of disbarment. Because we also believe a proper application of the ABA Standards for Imposing Lawyer Sanctions leads to the conclusion that the respondent's conduct warrants suspension, for a period sufficient to require his reinstatement following suspension, *see* C.R.C.P. 251.29(b), we now order the suspension of the respondent from the practice of law for a period of one year and one day beginning March 10, 2003, the effective date of the Board's order of disbarment.