The PEOPLE of the State of Colorado, Complainant,

v.

Bradley S. RHODES, Respondent.

No. 04PDJ044.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Feb. 7, 2005.

On November 8, 2004, a Hearing Board consisting of CYNTHIA F. COVELL and HAL B. WARREN, both members of the bar, and WILLIAM R. LUCERO, the Presiding Disciplinary Judge ("PDJ") conducted a hearing pursuant to C.R.C.P. 251.18(d). JAMES S. SUDLER appeared on behalf of the People, and CRAIG L. TRUMAN appeared on behalf of Respondent, BRADLEY S. RHODES, who was also present. The Hearing Board issues the following opinion:

## OPINION AND ORDER IMPOSING SANCTIONS

### *SANCTION IMPOSED: DISBARMENT*

### *I. ISSUE*

In Colorado, disbarment is *almost always* the appropriate sanction when a lawyer converts client money entrusted to him by the client. Before deciding an appropriate sanction, however, a hearing board must properly weigh the duty breached, the mental state of the lawyer, the injury caused, and the aggravating and mitigating factors presented. Where an attorney consciously converts client funds but presents significant evidence in mitigation, is a sanction short of disbarment appropriate?

### *II. PROCEDURAL HISTORY AND BACKGROUND*

The procedural history of this case is as follows. On May 19, 2004, the Office of Attorney Regulation Counsel ("OARC") filed a Complaint against attorney Bradley S. Rhodes ("Respondent"). On June 1, 2004, the Colorado Supreme Court issued an ORDER immediately suspending Respondent pursuant to C.R.C.P. 251.8(a). On July 23, 2004, Respondent filed an Answer to the

Complaint. On August 2, 2004, the People moved for Judgment on the Pleadings. Respondent stipulated to the facts in the Complaint, which establish the rule violations alleged therein. On August 27, 2004, the Presiding Disciplinary Judge ("PDJ") granted the OARC's motion for Judgment on the Pleadings.

Based upon the Judgment on the Pleadings, Claims I, II, and III are proven. These claims relate, respectively, to violations of: Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit, and misrepresentation); Colo. RPC 1.15(a) (failure to keep client funds separate from Respondent's own property); and Colo. RPC 1.15(b) (failure to promptly deliver client funds that the client is entitled to receive). Thus, the only issue for the Hearing Board to decide is the appropriate sanction for these rule violations.

Two witnesses testified at the hearing: David Japha on behalf of the People, and Respondent on his own behalf. The Hearing Board also considered the arguments of the People and Respondent, evidence in mitigation and aggravation, the parties' respective trial briefs, and the Stipulation of Facts. Neither party offered exhibits.

Respondent's counsel argues that a three-year suspension is sufficient to protect the public. The People seek disbarment. Upon consideration of all of the evidence and after weighing the relevant factors, the Hearing Board finds that disbarment is the appropriate sanction, despite Respondent's evidence in mitigation.

### III. FINDINGS OF FACT

The Hearing Board finds that the People proved the following facts by clear and convincing evidence.

#### Stipulated facts

Respondent has taken and subscribed the Oath of Admission, was admitted to the bar of this Court on October 30, 1998, and is registered as an attorney upon the official records of this Court, registration number 29960. Hence, the Respondent is subject to the jurisdiction of this Court.

Beginning in January 2004 and ending around March 2004, Respondent knowingly converted funds belonging to three clients. He then used the money to pay overhead for his law firm, the Rhodes Law Firm, LLC ("the Rhodes firm" or "the firm").

Almost all of the funds that he converted were settlement proceeds held in the firm's trust account for three separate personal injury clients: Jennifer Lang, Robert Coleman, and Mindy Talpalar. Respondent converted between $40,000 and $50,000 from these clients. Sometime in March of 2004, Mr. Japha and Mr. Ed Holub, lawyers associated with Respondent's firm, confronted Respondent about the shortfall they had discovered in the firm's trust account.

The first client, Jennifer Lang, was also Respondent's paralegal. Respondent represented her in a personal injury case involving an automobile accident and received a settlement check on her behalf. He first placed the settlement funds in the firm's trust account and then wrote Ms. Lang a check from the account in the amount of $9,693.92, representing her share of the settlement proceeds. On or about March 16, 2004, she deposited the check into her personal account, but the check bounced due to insufficient funds in the firm's trust account. Within a month and after borrowing money from his grandfather, Respondent made full restitution to Ms. Lang.

Robert Coleman, the second client, hired Respondent to represent him in a personal injury case. Respondent received about $55,000 in settlement of Mr. Coleman's case and placed these funds in the firm's trust account. Of the total settlement amount, Respondent and Mr. Coleman's shares were $22,000 and $33,000, respectively. Respondent then took at least $20,000 of Mr. Coleman's share from the trust account and deposited it into the firm's operating account. Shortly thereafter, Respondent entered into an agreement with Mr. Coleman to pay resti-

tution for the converted funds. As of the date of the hearing, however, Respondent still owed Mr. Coleman approximately half of the total amount, or $10,000.

Mr. Holub represented the third client, Mandy Talpalar, on a personal injury claim. Mr. Holub received a net settlement of almost $30,000 on Ms. Talpalar's behalf and placed these funds in the firm's trust account. However, Respondent converted part of these settlement funds from the firm's trust account. As a result, Ms. Talpalar did not receive her last settlement payment of $9,604.86. As in the case of Ms. Lang, Respondent promptly paid restitution to Ms. Talpalar shortly after his meeting with Mr. Japha and Mr. Holub.

Respondent converted these funds by writing checks on the firm's trust account payable to cash, cashing the checks at his bank, and depositing the cash into his firm's operating account. With the converted funds, Respondent paid office rent, payroll and insurance for the firm. At the time of this misconduct, Respondent also defaulted on a personal debt of $100,000 and a law firm debt in a like amount.

### Evidence presented in aggravation

The People called Mr. David Japha, Esq., a witness who offered evidence in aggravation. Mr. Japha met Respondent in 1998. At that time, Mr. Japha rented space from Zaplier and Associates, where Respondent worked as a law clerk. In July of 2003, Respondent took over and renamed the Zaplier law firm, thereby establishing Rhodes Law Firm, LLC. Mr. Japha then joined Respondent's firm as an associate, receiving a percentage of any earned profits from the clients he brought in to the firm and also drawing a salary of $2,500 per month.

On or about March of 2004, Mr. Japha and his legal assistant noticed some discrepancies in one of his client's accounts. Mr. Japha and Mr. Holub, the other lawyer working in Respondent's law firm, discovered that the firm's trust account had been overdrawn.

They discussed this matter with Respondent. When Mr. Japha confronted Respondent, he admitted taking client money from the trust account. Mr. Japha testified that he was upset with Respondent because Respondent had placed Japha and his clients in jeopardy by taking money out of the trust account.

Mr. Japha also testified that, while Respondent had potential as a lawyer, he "fell so short." During his experience with Respondent, Respondent did not appear to appreciate the distinction between the business aspects of the practice of law and the fiduciary duties owed to clients. Specifically, Mr. Japha testified that Respondent failed to pay Rhodes firm bills after he was suspended and failed to inform clients of his immediate suspension. Mr. Japha believes Respondent's actions demonstrate that he did not appreciate his fiduciary duties. Making a statement as a complainant, Mr. Japha further offered that, in his judgment, Respondent's egregious act of misappropriating client funds from the firm's trust account warrants disbarment.

### Evidence presented in mitigation

Respondent testified that he was licensed to practice law in Colorado in 1998. Thereafter, he worked as a litigation associate with Zaplier and Associates. In his words, he developed a reputation for successfully trying personal injury cases with the Zaplier law firm.

After these early successes as an associate, Respondent took over Zaplier and Associates, creating his own firm, the Rhodes firm, in its stead on January 1, 2000. He was the managing partner of the Rhodes firm, and Mr. Zaplier and another lawyer named Mr. Ferris were "silent partners" who withdrew in July 2003. Mr. Japha and Mr. Holub both worked for the firm.

Respondent felt that he had the background and experience to run a law firm because he had run a process-serving business while in law school. Initially, as the owner of the Rhodes firm, Respondent ad-

vanced in his personal injury practice. Although Mr. Japha and Mr. Holub drew salaries, they were also required to contribute to the firm for their share of the overhead. The firm, however, soon suffered a shortfall in revenues. Neither Respondent nor the firm had the money to cover the monthly overhead.

Respondent received a $72,000 salary from the firm in 2000 and an $82,000 salary in both 2001 and 2002. In 2003, he did not earn a salary and in 2004 he paid himself $15,000. Respondent testified, without challenge, that the initial overhead for the law firm was approximately $45,000 per month. He attempted at first to use personal credit cards to make up the difference that resulted from the shortfall in revenues, but this only exacerbated his personal debt and did little to alleviate the financial problems of the firm.

After the departure of Mr. Zaplier and Mr. Ferris, Respondent assumed both the legal and business responsibilities of the firm. Respondent felt that in order to make more money, he had to spend more money. Ultimately, the firm's overhead rose to over $45,000 per month. Since Mr. Japha's practice depended in good measure on criminal appointments in state and federal court, Mr. Japha at times failed to meet his commitment to the firm's overhead. Ultimately, Respondent found the pressures of his commitment to the firm, his clients, and wife and two infants overwhelming.

Instead of seeking advice, hubris led Respondent to believe he could "please everyone." He believed he would be able to run the firm as he always had, even when it was clear that there was no money to do so.

As Respondent's debt rose, he had conflict at home and at work. Respondent also argued with Mr. Japha about Mr. Japha's failure to bill properly. He felt that this problem exacerbated the firm's financial problems. In an effort to retain the illusion that he could run the firm, he converted client funds. Fortunately, his associates fairly quickly found the discrepancies in the firm's trust account.

In 2003, Respondent sought help from the Lawyer's Assistance Program; he had been contemplating suicide for eight months. He received a prescription for Wellbutrin and Lexapro, medications for depression that he continues to take to this date. In October 2003, Respondent spent three days in the hospital after suffering from a panic attack and chest pains while preparing for a trial.

Following his immediate suspension on June 1, 2004, Respondent notified clients of his suspension, moved from the firm's office space, transferred his clients to Mr. Zaplier and Mr. Ferris, and moved to Kansas City where he and his wife and two infants now live in a two-bedroom apartment. Today, Respondent works at a truck stop owned by his father and earns $38,000 per year.

## IV.  SANCTIONS

The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") and Colorado Supreme Court case law are the authorities for selecting and imposing sanctions for lawyer misconduct. The appropriate sanction depends upon the facts and circumstances of each case.

### Analysis Under the ABA *Standards*

Under ABA *Standard* 4.11, "disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Generally, suspension is reserved for misconduct, such as commingling funds, that does not amount to misappropriation or conversion of funds for the attorney's own use. ABA *Standard* 4.12 (commentary). However, in determining the appropriate sanction, ABA *Standard* 3.0 directs the Hearing Board to examine the following factors:

(1) the duty breached;

(2) the mental state of the lawyer;

(3) the injury or potential injury caused; and

(4) the aggravating and mitigating evidence.

## 1. Duty

■ Respondent violated a duty to the public and the legal profession. However, the most important duty he violated was that owed to his clients. The clients sought his counsel, trusted his judgment, and expected that he would handle their affairs and settlement proceeds accordingly. Respondent's failure to act with integrity when dealing with client property was egregious.

## 2. Mental State

■ The Parties have stipulated that Respondent knowingly misappropriated funds belonging to clients. According to the ABA *Standards* (III. Black Letter Rules: *Definitions*), "knowledge" means "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." The evidence, however, demonstrates that Respondent acted not only with knowledge of his actions, but also with intent. "Intent" is "the conscious objective or purpose to accomplish a particular result." Here, Respondent acted with the *conscious purpose* of taking client money both for his own benefit and that of his law firm.

## 3. Injury

■ The three clients suffered actual and potential injury when Respondent converted more than $50,000 of their personal property. Although Respondent fairly quickly paid back the funds owed to two of his clients, he did not make payment until lawyers in his firm confronted him with evidence of the conversion. In addition, Respondent still owes one of the clients approximately $10,000. Furthermore, given his dire financial position, had Respondent not been able to borrow money from his grandfather, the clients would have suffered a total loss.

## 4. Aggravating and Mitigating Factors

### Aggravating Factors, ABA *Standard* 9.2

#### A. Dishonest or Selfish Motive

■ Respondent acted dishonestly and with a selfish motive. While Respondent presented evidence that he converted client funds to keep his firm solvent, this motivation, nevertheless, amounts to a selfish motive. Equally important is the dishonesty inherent in his actions. He took advantage of the confidence his clients, colleagues, and the profession placed in him. He chose to promote his law firm above the needs of his clients.

### B. Pattern of Misconduct/Multiple Offenses

■ The Hearing Board finds in this case that the evidence of multiple offenses and a pattern of misconduct merge. Respondent took client money from three separate clients. In addition, each time Respondent drew a check on the firm's trust account, he committed a new offense. As a result, he committed five separate offenses.

### C. Vulnerability of Victim

■ Ms. Lang, Mr. Coleman, and Ms. Talpalar sought help from Rhodes firm lawyers after suffering personal injuries. When Respondent took their money, he took advantage of the trust they placed in him. There is no evidence, however, that any of the victims suffered a disability or were otherwise vulnerable *beyond* the vulnerability of any client who depends upon his/her attorney to act with integrity in their affairs.[1]

### Mitigating Factors, ABA *Standard* 9.3

#### A. Absence of a Prior Disciplinary Record

Respondent has no prior disciplinary actions. He has been licensed in Colorado for five years.

#### B. Personal or Emotional Problems

■ Neither Party presented evidence from an expert on this point. Respondent,

---

1. Respondent testified that, although there was a dispute during the arbitration of Mr. Coleman's case about impairment of Mr. Coleman's cognitive abilities, Mr. Coleman fully understood and agreed to the payment arrangements Respondent made with him. This testimony was undisputed.

however, testified at length about the pressures he felt as the result of personal and private debt he owed. Respondent admitted that he contemplated committing suicide as a result of these pressures. Recognizing this problem, he sought and received help from the Lawyer's Assistance Program. He then received a prescription for Wellbutrin and Lexapro from a psychiatrist in the Lawyer's Assistance Program to help deal with his depression. The People do not dispute these claims.

Respondent continues to use this medication but is not seeing a psychiatrist at this time. In spite of his emotional problems, he did appear and testify in these proceedings. While Respondent's emotional condition likely existed at the time he converted client funds, he presented no evidence that such condition caused his misconduct. *See People v. Lujan*, 890 P.2d 109, 110 (Colo.1995) (suspension appropriate when the respondent's mental disability caused her to convert firm funds). Respondent testified that he can be a good lawyer and has learned from this experience. He admits, however, that at present he cannot cope with the pressures of practicing law.

### C. Timely Good Faith Effort to Make Restitution/Rectify Consequences of Misconduct

█ Prior to any disciplinary or court action, the Respondent paid or committed to pay restitution to his clients. Within 30 days, he paid Ms. Lang and Ms. Talpalar in full. Mr. Coleman agreed to accept monthly payments until Respondent paid his restitution of approximately $20,000 in full. Respondent continues to pay Mr. Coleman, though he has missed payment to him on occasion. He still owes approximately $10,000.

### D. Full and Free Disclosure to Disciplinary Board/Cooperative Attitude Toward Proceedings

█ Respondent has openly admitted his misconduct in converting client funds and has cooperated in these proceedings. His conduct since the conversion shows his willingness to resolve this case professionally. Although he considered not appearing for the hearing on sanctions, he did appear out of respect for the process. This attitude bodes well for his potential rehabilitation.

### E. Inexperience in the Practice of Law

█ Respondent practiced law for approximately five years before he committed the misappropriation that is the subject of this case. However, he had practiced law for only roughly two years before taking on the role of managing partner. The Hearing Board finds that this exceedingly short timeframe left Respondent woefully unprepared to manage the business aspects of the firm while also performing his duties as trial attorney. More importantly, his inexperience and hubris led Respondent to believe he could handle all the financial responsibilities and that he needed no help in doing so. The Hearing Board notes, however, that "[i]nexperience in the practice of law is of little or no importance as a mitigating factor when the lawyer's conduct is dishonest." *In re Thompson*, 991 P.2d 820, 823 (Colo.1999).

### F. Interim Rehabilitation

█ Although Respondent did not present evidence of his *complete* rehabilitation, he should be given some credit for seeking professional help to cope with his depression, an illness from which he apparently still suffers. Respondent sought and received professional help and continues to take medication for depression. Though he is not presently under a psychiatrist's care, he continues to take Wellbutrin and Lexapro, medications for depression that the Lawyer's Assistance Program prescribed for him following a consultation.

### G. Remorse

█ Respondent is remorseful for his acts of dishonesty and the harm he has

caused his family and the profession. Respondent's demeanor in court and his prompt action in making restitution to his clients amply demonstrate his remorse. While he did not self-report his conversion of the firm's trust fund monies before others discovered it, he did promptly acknowledge guilt when Mr. Japha and Mr. Holub confronted him with their discovery of the missing funds.

### Analysis Under Case Law

Knowing conversion "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996) (quoting *In re Noonan,* 102 N.J. 157, 506 A.2d 722, 723 (1986)). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. *Id.* At 10–11. The Colorado Supreme Court has indicated that lawyers are "almost invariably disbarred" for knowing misappropriation of client funds. *Id.* at 11; *People v. McGrath,* 780 P.2d 492, 493 (Colo.1989) ("the Court would not hesitate to enter an order of disbarment if there was no doubt that the attorney engaged in knowing conversion of his client's funds"); *In re Thompson,* 991 P.2d at 823; *People v. Lavenhar,* 934 P.2d 1355 (Colo.1997); *People v. Lefly,* 902 P.2d 361 (Colo.1995); *People v. Young,* 864 P.2d 563 (Colo.1993) (conversion of clients' funds warrants disbarment even absent prior disciplinary history and despite cooperation and making restitution).

■ However, under exceptional circumstances, even conversion of client funds may warrant a sanction less than disbarment. *See People v. Dice,* 947 P.2d 339 (Colo.1997) ("[w]e have repeatedly held that a lawyer's knowing misappropriation of funds ... warrants disbarment except in the presence of extraordinary mitigating factors"). For example, in *People v. Lujan,* the Supreme Court approved a suspension rather than disbarment for conversion because the respondent presented substantial evidence of mental disability, and proved that the mental disability actually caused the misconduct. 890 P.2d at 112–113. Other mitigating factors were also present, including good character and reputation as well as interim rehabilitation. *Id.*

■ Recently, the Supreme Court has reminded hearing boards not to overlook significant mitigating factors that may overcome the presumption of disbarment. *In the Matter of Fischer,* 89 P.3d 817 (Colo.2004). Thus, it is incumbent upon hearing boards to properly consider evidence in mitigation, and to recognize that each case presents unique facts and perhaps a need for a different sanction.

In *Fischer,* the Court disapproved disbarment. *Id.* That case, however, did not involve stealing client money. Rather, the attorney had deviated from a separation agreement disbursement schedule without first obtaining court approval. Mitigating factors included the lack of an attempt to falsify, deceive or conceal the misconduct. In addition, the attorney accepted personal responsibility for *all* the debts subject to the separation agreement and *all* additional expenses. Finally, the Court believed that, while the attorney knowingly misappropriated third party funds, he thought he was simply attempting to overcome hurdles in liquidating assets and it had not occurred to him that he was violating a court order. *Fischer* is thus readily distinguishable from cases in which the attorney flagrantly abuses a client's trust by treating client funds as his own. *Id.* at 821.

■ The People assert that the *only* sanction appropriate for Respondent's conversion of client funds is disbarment. Respondent urges the Hearing Board to follow the *Fischer* rationale in finding that disbarment is not mandated in this case. Respondent argues that the mitigating factors present outweigh the aggravating factors. The Hearing Board agrees that it must appropri-

ately balance the duty breached, Respondent's mental state, the injury he caused, and the mitigating and aggravating factors before arriving at the appropriate sanction, despite Respondent's admission that he converted client funds. After doing so, the Hearing Board finds that disbarment is the appropriate sanction.

The Hearing Board notes that the cases in which the Colorado Supreme Court has ordered a sanction short of disbarment for knowing conversion of funds are few, and distinguishable from the present case. For example, Respondent did not offer evidence that he suffered from a serious mental disorder that caused his misconduct, as was the case in *Lujan.* 890 P.2d at 112–113. This is not a case of technical conversion, where Respondent simply acted negligently with trust fund money. *See People v. Dickinson,* 903 P.2d 1132, 1138 (Colo.1995). Further, the lawyer in *Fischer* did not convert client funds in the way that Respondent did. *See In re Fischer,* 89 P.3d at 821. In fact, *Fischer* is readily distinguishable from the present case in a number of ways. Most important, Fischer did not violate any duties owed to his client. *Id.* The nature of Fisher's actions shows that he was much less culpable than Respondent. Unlike Respondent, Fischer:

1. *took no client money;*
1. *did not treat* the funds he took *as his own;*
2. *did not benefit* from the misappropriation of *client* funds;
3. *did not conceal* his actions in taking *third party* funds;
4. *had not* been *fully paid for the work* he did for the client before taking money he earned; and
5. *acted out* of a belief, albeit misguided, that he was zealously representing his client's best interests in not paying money to a third party.

*See id.* Finally, the Hearing Board finds that Fischer's evidence in mitigation was quite compelling. *See id.*

Here, Respondent admitted that he knowingly used funds belonging to three clients. The evidence shows that he had knowledge of his actions and acted with the intent to deprive his clients of funds that rightly belonged to them, even if he may not have intended to permanently deprive them of their money. While Respondent acted with a motive to save his firm, this does not diminish the harm he caused his clients, the public, and the legal profession. At its core, Respondent's misappropriation of client funds demonstrates a lack of integrity that necessarily raises a serious question about his fitness to practice law.

The Hearing Board understands that Respondent acknowledged his misconduct and promptly paid restitution (or made arrangements to pay restitution) to his clients. The Hearing Board also understands that Respondent admitted his misconduct to the OARC and fully cooperated in this proceeding. This evidence demonstrates an acceptance of personal responsibility that *could* diminish the need for further public protection if the facts were closer to those in *Fischer.*[2] However, the conduct in this case goes well beyond the open misapplication of third party funds in violation of a court-approved settlement. *See id.* Though Respondent attempted to ameliorate the damage he caused, the mitigating factors are not sufficient to take this case out of the category of cases calling for disbarment. For example, while Respondent testified regarding some interim rehabilitation efforts, the Hearing Board was required to evaluate Respondent's character and reputation from the conflicting testimony of Mr. Japha and Respondent.

Though we have found seven mitigating factors and only three in aggravation, the totality of all the factors outlined in ABA *Standard* 3.0, including (1) duty, (2) injury, (3) state of mind, and (4) aggravation, outweigh the mitigating factors and support a

---

**2.** If our rules provided for a sanction greater than a three-year suspension but less than disbarment, the Hearing Board would have considered a lesser sanction. However, the forms of discipline are limited to the following: disbarment, suspension not to exceed three years, public censure, and private admonition. C.R.C.P. 251.6.

recommendation of disbarment. While *Fischer* stands for the proposition that the Hearing Board must properly balance the mitigating and aggravating factors, it does not mandate that these and the other factors be weighed individually or equally, but rather in totality. Here, the Hearing Board finds that the combination of Respondent's conscious conversion of client funds, the multiple offenses he committed, and his clients' dependence upon him to act with integrity in their affairs, outweighs his efforts to rectify the damage he caused. Accordingly, the Hearing Board concludes that the mitigation offered was not of the quality and quantity sufficient to overcome a presumption of disbarment.

## V. CONCLUSION

One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. Respondent's knowing and intentional conversion of client funds raises a substantial question regarding whether he poses such a danger. Because Respondent harmed his clients, his colleagues, and the legal profession, the Hearing Board would be shirking its duty to protect the public by recommending a sanction short of disbarment.

## VI. ORDER

It is therefore ORDERED:

1. BRADLEY STEVEN RHODES, attorney registration number 29960, is DISBARRED from the practice of law, effective thirty-one (31) days from the date of this Order, and his name shall be stricken from the list of attorneys licensed to practice law in the State of Colorado.

2. BRADLEY STEVEN RHODES is ORDERED to pay the costs of this proceeding; the People shall submit a Statement of Costs within fifteen (15) days of the date of this Order. Respondent shall have ten (10) days in which to respond.

CONCURRING OPINION (COVELL).

I reluctantly concur with the Opinion and Order imposing the sanction of disbarment in this case. I agree that Respondent's knowing and intentional conversion of client trust funds is egregious, and that Colorado Supreme Court precedent supports disbarment as the appropriate sanction absent extraordinary circumstances, which are not found here. Short of disbarment, the greatest sanction available is a three-year suspension. ABA *Standard* 4.42 finds suspension appropriate where a lawyer knowingly fails to perform services for a client or engages in a pattern of neglect, and causes injury or potential injury to a client. When such neglect rises to the level of abandonment of a lawyer's practice, or results in serious injury to a client, disbarment is generally appropriate. ABA *Standard* 4.41.

There is no intermediate sanction that recognizes both the seriousness of conversion of client funds *and* the public interest that is served when a lawyer takes responsibility for misconduct, makes restitution, and cooperates fully with the disciplinary process. Disbarring Mr. Rhodes notwithstanding his restitution, remorse and cooperation may well discourage other lawyers from acknowledging responsibility for their wrongdoing, making voluntary restitution and cooperating with the disciplinary process, to the overall detriment of wronged clients, the profession, and the public in general. Although Mr. Rhodes' wrongful conduct cannot be condoned, his actions thereafter demonstrate more integrity and potential for rehabilitation than is shown by some respondents in other cases of disbarment, such as the recently-decided case of *People v. Blasé*, 106 P.3d 1057 (Colo.O.P.D.J.2005), in which the respondent abandoned numerous clients, refused to return thousands of dollars of unearned client retainers, and failed to appear or participate in disciplinary proceedings. To impose the same sanction—disbarment—on both Mr. Rhodes and Ms. Blasé overlooks the benefit to the public and the profession that accrues when a lawyer takes personal responsibility for his or her actions, freely

admits misconduct, pays or makes arrangements to pay for the clients' losses, and cooperates fully in the disciplinary process.

I am very troubled that no intermediate sanction is available (such as suspension for longer than three years) that would recognize both the seriousness of conversion of client funds and also that the public interest is served when lawyers acknowledge their misconduct, demonstrate remorse, and voluntarily make arrangements for restitution, as Mr. Rhodes has done here. In this case, I believe the public would be best served by imposing a significant suspension on Mr. Rhodes and requiring as conditions of reinstatement that he complete his restitution obligation, obtain appropriate training in law office management, a practice monitor, treatment for his mental condition, and such other conditions as are deemed necessary to protect the public and his future clients. I would urge the Colorado Supreme Court to include such an intermediate sanction in Rule 251.6.