109 P.3d 1075 (2005)
The PEOPLE of the State of Colorado, Complainant,
v.
Lawrence C. RIDER, Respondent.
No. 04PDJ077.
Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.
April 13, 2005.

*1076 AMENDED OPINION AND ORDER IMPOSING SANCTIONS
On July 30, 2004, the Office of Attorney Regulation Counsel ("OARC") filed a Complaint against attorney Lawrence C. Rider ("Respondent"). Respondent answered the Complaint on September 1, 2004, admitting all factual allegations, but reserving the right to be heard on the issue of sanctions. On September 23, 2004, the People moved for judgment on the pleadings, which Respondent did not oppose. On September 24, 2004, the Presiding Disciplinary Judge ("PDJ") granted the People's motion on the only Claim in the Complaint, violation of Colo. RPC 8.4(c), engaging in conduct involving dishonesty, fraud, deceit, and misrepresentation. Thus, the only remaining issue is the appropriate sanction for the misconduct Respondent admits.
On November 2, 2004, a Hearing Board consisting of Thomas J. Overton, a member of the bar, Frances L. Winston, a representative of the public, and William R. Lucero, the Presiding Disciplinary Judge, heard and deliberated on evidence presented under C.R.C.P. 251.18(d). Charles E. Mortimer, Assistant Regulation Counsel, represented *1077 the Office of Attorney Regulation (the "People"). E. Gregory Martin represented Respondent Lawrence C. Rider.
The following witnesses testified on behalf of Respondent: former Colorado Supreme Court Justice Jean Dubofsky, District Court Judge Morris Sandstead, John R. Mehaffy, Esq., Lane Earnest, Esq., Martha Ridgway, Esq., and Pastor John Hess. The Hearing Board also heard and considered testimony from Respondent. In addition, Respondent offered and the PDJ admitted trial Exhibits A (a letter from James T. Dunn, the Complainant) and B (an affidavit from Melody Fuller, the President of the Boulder County Bar Association). The People presented no evidence.
The Hearing Board considered the parties' Trial Briefs and oral arguments, their Stipulation of Facts, and the evidence presented at trial, including the credibility of witnesses. On January 3, 2005, the Hearing Board issued an Opinion and Order Imposing Sanctions in this case, disbarring Respondent Lawrence C. Rider from the practice of law in Colorado. In the Opinion, the Hearing Board specifically found, based upon the representation of the Parties, that Respondent had no prior discipline. Since that time, evidence of a prior private censure has surfaced. Consequently, the Parties jointly requested that the Hearing Board amend its Opinion to reflect the fact of prior discipline. Accordingly, this Amended Opinion and Order Imposing Sanctions is intended to replace the January 3, 2005 Opinion and Order Imposing Sanctions.

SANCTION IMPOSED: ATTORNEY DISBARRED

I. ISSUE
A lawyer who knowingly misappropriates $148,000 from the estate of an ill and elderly woman, over eight years and while acting as her conservator, egregiously violates his duties to his client and the legal system. Under these circumstances disbarment would normally be the appropriate sanction. But is a lesser sanction appropriate if the lawyer expresses genuine remorse, makes full restitution, and presents evidence of an excellent reputation?
Despite the mitigation presented, the Hearing Board concludes that disbarment is appropriate in this case.

II. FINDINGS OF FACT
The Hearing Board finds that the People proved the following facts by clear and convincing evidence:
Respondent has taken and subscribed the Oath of Admission, was admitted to the Bar of this Court on October 4, 1968, and is registered as an attorney upon the official records of this Court, registration number 771. Hence, Respondent is subject to the jurisdiction of this Court and the Office of the Presiding Disciplinary Judge in these proceedings. Throughout his career, Respondent has practiced law from offices located in Boulder, Colorado.
In the early 1990's, Mr. James Dunn, an attorney in Utah, called Respondent to ask if he would be willing to represent Mary Halverson, an elderly women who suffered from a bipolar disorder. Ms. Halverson required the services of counsel in a variety of matters, including fraud claims relating to the sale of horses and a breach of contract claim involving horse trailers. At the time, Ms. Halverson was living near Chimney Rock in Archuleta County, Colorado.
With knowledge of her bipolar condition, Respondent agreed to represent Ms. Halverson. Thereafter, he met with her and discovered that she did not trust the lawyers in Archuleta County. Respondent also soon discovered that Ms. Halverson was a client who required much of his time, particularly because he traveled from Boulder to Chimney Rock to tend to her legal needs. For example, Ms. Halverson, according to the Respondent, had challenged the sheriff to a gunfight and he had to go to Chimney Rock to resolve the matter. On other occasions, the Respondent helped Ms. Halverson deal with other matters including disputed credit card charges.
As time passed, Ms. Halverson's mental condition deteriorated and she needed someone to assist her in handling a portion of her financial affairs. In 1993, Mr. Dunn suggested, *1078 and Respondent agreed, that the Respondent would act as Ms. Halverson's conservator. Accordingly, in 1993, the district court in Archuleta County appointed Respondent conservator for Ms. Halverson. Nevertheless, she continued to carry on day-to-day financial activities, including maintaining her own bank accounts and making her own purchases. Eventually, however, Ms. Halverson needed to leave her ranch in Archuleta County. As conservator, Respondent assisted with the sale of Ms. Halverson's 63-acre ranch and its contents. Likewise, he then maintained control over the proceeds.
Following his appointment as conservator in 1993 and through November 1996, Respondent filed inventory and accounting reports with the district court each year. During this time, he also applied twice for payment from Ms. Halverson's estate for legal fees incurred as conservator. The court approved both requests. Thus, he received a total of $35,430.87 for services he provided through 1996. Though he should have, Respondent filed no reports with the district court after November 1996. He testified that he provided an additional $16,000 in legal work after 1996, but did not submit these fees to the court for payment.
After Ms. Halverson left her ranch, she lived in Boulder County for a brief time. Then, in 2000, because her mental and physical condition worsened, she moved from Boulder to an assisted living facility in Utah. Shortly thereafter, the district court dismissed the conservatorship.
When Ms. Halverson died on March 1, 2002, Mr. Dunn was both the beneficiary and executor of her estate. In April 2002, Respondent gave Mr. Dunn a check for $300,000, funds that Respondent represented were due the estate. Respondent provided no accounting with the check. He explained to Mr. Dunn that there were a few matters he needed to complete in order to close the estate, and that there was a remainder of $9,000 due the estate.
Following Ms. Halverson's death, Mr. Dunn worked with Mr. Russell Whitehouse, CPA, to administer the estate. Mr. Dunn and Mr. Whitehouse made at least nine written requests to Respondent for complete accountings. As of November 3, 2003, Respondent had not given Mr. Dunn accountings for calendar years 1999, 2000 and 2001, or for January and February of 2002. Mr. Dunn told Respondent that he would report this matter to the OARC if Respondent did not provide an accounting as requested. Nevertheless, Respondent did not do so. Respondent testified that he attempted several times to prepare an accounting for Mr. Dunn, but could not. He described himself as "paralyzed" and unable to act. Mr. Dunn reported these grievances against Respondent to the OARC on November 3, 2003.
The OARC mailed Mr. Dunn's request for investigation to Respondent on November 12, 2003, and asked him to respond. Respondent received this mailing and asked for three enlargements of time to answer Mr. Dunn's complaint. The OARC granted these requests. Ultimately, Respondent promised he would respond by February 2, 2004, but he did not. As a consequence, the OARC subpoenaed Respondent to be deposed on February 17, 2004.
Respondent appeared at the deposition and answered questions about his appointment and role as conservator for Ms. Halverson's estate. Specifically, Respondent testified under oath that his failure to provide an accounting was due to the lack of certain records necessary to complete it. He swore under penalty of perjury that the problem rested with an outside investment firm, which had failed to provide him with account statements on the conservatorship. In fact, this was not true. Respondent had most, if not all, of the records needed to complete an accounting. These records, however, would have revealed his misappropriation of $148,000 from Ms. Halverson's estate.
At trial, Respondent testified that he thought he could "out-smart" everyone. He believed that he could pay back the money in the long run, without anyone discovering his misconduct. Before attending the deposition, Respondent designed his defense and considered creating false documents to substantiate his story about the investment firm error.
*1079 However, Respondent never acted on the impulse to create false documents. Instead, he attended the deposition with a plan to delay the process further by claiming that he just did not have the necessary documents. The deposition started at 8:58 a.m. and finished at 9:56 a.m. After Respondent left the OARC offices, he sat in his parked truck and struggled with his conscience. He realized the gravity of lying under oath, and felt that he could no longer hide what he had done. He returned to the OARC offices and admitted to Mr. Mortimer that he had not told the truth during his deposition. He confessed that he had misappropriated funds belonging to Ms. Halverson. At the time, he was visibly distressed and the OARC referred him to a grief counselor.
A few days after his disclosure, Respondent provided the OARC with two boxes of documents, primarily bank records, showing activity on accounts belonging to the conservatorship. Respondent reported that at the time, his records were in a state of "chaos." The OARC supplied copies of these records to Mr. Dunn and Mr. Whitehouse. Upon review of the records, they confirmed that Respondent had misappropriated approximately $148,000. The records showed that Respondent wrote approximately 80 checks to himself or his creditors from Ms. Halverson's estate over a period of eight years while he was her conservator. Most important, the records also showed that Respondent wrote the first of the unauthorized checks within one month of his appointment as conservator.
The records also detailed how and when Respondent misappropriated Ms. Halverson's money. In one instance, Respondent sold a truck belonging to Ms. Halverson to a company his son owned for $7,500. He did not, however, collect the full purchase price at the time of sale. After his son's company failed, Respondent neglected to pursue payment of the remaining $2,800 for the benefit of Ms. Halverson's estate.
When he wrote unauthorized checks, Respondent justified his actions by convincing himself that he would pay the estate back. He further justified his actions by reasoning that his legal fees would cover the amounts taken. When asked what he spent the money on, Respondent testified that it was initially to pay taxes he urgently needed to pay. Later, he took money when he needed it, even for groceries. Respondent offered no other evidence to explain why he took the money.
While Respondent had access to the Halverson funds, he had no meaningful oversight. Though he had a duty to account to the court regarding his activities as a conservator, he did not do so after November 2003. Even when he did, he provided no information disclosing his misappropriation of estate funds. Meanwhile, Mr. Dunn and Ms. Halverson trusted Respondent to handle the estate honestly.
Following his admission of misconduct to the OARC on February 17, 2004, Respondent told counsel for Mr. Dunn that he intended to repay the funds he misappropriated. Respondent then met with Mr. Dunn in Salt Lake City and reached an agreement on restitution. Respondent refinanced his house and paid the restitution to Ms. Halverson's estate with the loan proceeds.
On or about August 6, 2004, the People received a letter from Mr. Dunn. Mr. Dunn reported that the Respondent had made a complete accounting of the conservatorship funds, as well as money due and owing to the estate. Mr. Dunn "supports reinstatement" of Respondent's license to practice law.
Respondent enjoys a sterling reputation in the legal community. The witnesses who testified on his behalf urge the Hearing Board to consider a lengthy suspension instead of disbarment. They believe the misappropriation described above was an aberration, and will not likely recur. They point out that, apart from these events, Respondent has been an exemplary lawyer. However, Respondent has been disciplined before. The Supreme Court privately censured him in 1993.

III. IMPOSITION OF SANCTIONS
The ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards") are the guiding authority for selecting the appropriate sanction to impose *1080 for lawyer misconduct. In determining the appropriate sanction, ABA Standard 3.0 directs the Hearing Board to examine the following factors:
(1) the duty breached;
(2) the mental state of the lawyer;
(3) the injury or potential injury caused; and
(4) the aggravating and mitigating evidence.
The act of knowing misappropriation "consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking." People v. Varallo, 913 P.2d 1, 11 (Colo.1996) (quoting In re Noonan, 102 N.J. 157, 506 A.2d 722, 723 (1986)). Neither the lawyer's motive in taking the money, nor the lawyer's intent regarding whether the deprivation is temporary or permanent, are relevant for disciplinary purposes. Id. at 10-11.
The presumptive sanction for knowing conversion of client property entrusted to an attorney is disbarment. ABA Standard 4.11 states: "Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client." Generally, suspension is reserved for misconduct, such as commingling funds, that does not amount to misappropriation or conversion of funds for the attorney's own use. ABA Standard 4.12 (commentary). Likewise, the Colorado Supreme Court has indicated that lawyers are "almost invariably disbarred" for knowing misappropriation of client funds. Varallo, 913 P.2d at 11; People v. McGrath, 780 P.2d 492, 493 (Colo.1989) ("the Court would not hesitate to enter an order of disbarment if there was no doubt that the attorney engaged in a knowing conversion of his client's funds").
Nevertheless, the Supreme Court has always deemed extraordinary mitigating factors an important part in determining an appropriate sanction, even in cases involving conversion of client funds; People v. Dice, 947 P.2d 339 (Colo.1997) ("[w]e have repeatedly held that a lawyer's knowing misappropriation of funds . . . warrants disbarment except in the presence of extraordinary mitigating factors").
More recently the Supreme Court reminded hearing boards not to overlook significant mitigating factors that may overcome the presumption of disbarment. In the Matter of Fischer, 89 P.3d 817 (Colo.2004). Thus, it is incumbent upon hearing boards to properly consider evidence in mitigation, and to recognize that each case presents unique facts and perhaps a different need for sanctions.
In Fischer, the Court disapproved disbarment. That case, however, did not involve stealing client money. Rather, the attorney had deviated from a separation agreement disbursement schedule without first obtaining court approval. Mitigating factors included lack of an attempt to falsify, deceive or conceal the misconduct. In addition, the attorney accepted personal responsibility for all debts subject to the separation agreement and all additional expenses. Finally, the Court believed that, while the attorney admitted knowingly misappropriating third party funds, he thought he was simply attempting to overcome hurdles in liquidating assets and it had not occurred to him that he was violating a court order. Fischer is thus readily distinguishable from cases in which the attorney flagrantly abuses a client's trust by treating client funds as his own. Id. at 821.
The Hearing Board finds the following evidence relevant to determining the appropriate sanction.

A. MATTERS IN MITIGATION

1. PERSONAL AND EMOTIONAL PROBLEMS
Respondent presented no expert evidence on this issue. However, one lay/fact witness did offer her perspective on this point. This witness felt that Respondent's actions were a call for help because Respondent was overwhelmed with the practice of law.
Respondent also testified that he sought psychiatric assistance to understand why he took the money from Ms. Halverson's estate. He briefly saw two psychiatrists, *1081 but soon stopped meeting with them. He did not think the first psychiatrist was helpful, and he discontinued meeting with the second due to a lack of money.

2. RESTITUTION
The Complainant, Mr. Dunn, states that Respondent has "completed restitution and has paid all amounts due and owing to the estate." The Hearing Board notes, however, that restitution was made only after Mr. Dunn lodged a complaint with the OARC.

3. REPUTATION
In over 35 years as a lawyer, Respondent has built a solid reputation. A host of highly respected members of the legal community, who know Respondent professionally and personally, offered credible testimony in this regard.
One of the witnesses described Respondent, his wife, and his children as the "quintessential American family." Respondent's law partner for over 30 years testified that he would "never question" Respondent's honesty. A well-respected Boulder lawyer with 35 years of legal experience testified that Respondent's reputation was "superb." An 18-year attorney, who practices in Boulder County and has tried a number of contentious divorce cases against Respondent, described his reputation as "outstanding." In addition, the Assistant Pastor of the First Presbyterian Church of Boulder testified about the pro bono and charitable work Respondent had done for clients and members of the church, describing him as always "available and credible." Finally, a Boulder District Court Judge testified that Respondent was "one of the great guys" and a man of "great integrity," based upon his knowledge of Respondent as a lawyer and a friend.
Although Respondent's reputation is undeniable, its weight as a mitigating factor is significantly reduced by the presence of prior discipline. To a certain extent, Respondent's reputation may have to do with his ability to conceal any wrongdoing.
Respondent has indeed served the legal community throughout his career. Exhibit B, an affidavit executed by Melody K. Fuller, the President of Boulder County Legal Services, details the contributions Respondent has made to the profession. They include a wide range of pro bono services, particularly in the areas of family law and children's issues. Respondent has represented a family that was victimized by a mortgage scam, mobile home owners seeking justice against a mobile home park owner, and a mentally disabled adult who needed assistance in recovering funds from a bank.

4. REMORSE
Respondent is remorseful for the harm he caused his family, his colleagues, and the legal profession. His demeanor shows the depth of his contrition. He recognizes his ethical violations and has accepted full responsibility for his actions. Although he delayed eight years in admitting his wrongdoing, he ultimately did so, and thereafter fully cooperated with the OARC. On the other hand, the Hearing Board also notes that Respondent does not fully acknowledge the harm to his client, Ms. Halverson. Instead, Respondent offers that he took care of her needs.

B. MATTERS IN AGGRAVATION:

1. PRIOR DISCIPLINARY OFFENSES
Respondent has one prior disciplinary offense. In 1993, the same year that he was appointed as Ms. Halverson's conservator, Respondent was subject to private censure by the Supreme Court. As the legal representative and attorney-in-fact of a trust, Respondent accepted a $50,000 zero interest loan from trust proceeds without advising the settlor and the trustee that the various interests may differ, that the loan terms may be detrimental to the trust, and that another attorney should be consulted to review the transaction. The trust lost approximately $10,000 as a result of the loan.

*1082 2. DISHONEST OR SELFISH MOTIVE
Respondent testified that, while he took money from Ms. Halverson's estate for "urgent" needs including taxes, he also took money simply for whatever he needed. There was no detailed testimony with respect to how he spent the $148,000. Undoubtedly, he put his own needs and desires ahead of the needs and desires of Ms. Halverson, an elderly woman who suffered from health and psychological problems and who depended upon him for protection.
More important, this was not an instance of immediate disclosure and restitution following a single act or series of acts of conversion within a short period of time. Respondent concealed his actions and carried on his deceit for eight years, misleading the court, Mr. Dunn, and Ms. Halverson. A number of witnesses candidly stated that, knowing what they know about this case, they would not likely recommend Respondent as a conservator for one of their clients.

3. MULTIPLE OFFENSES
This was not a single instance of misappropriation. Respondent misappropriated money from Ms. Halverson's estate within a month of his appointment as conservator. From that point on, Respondent took money whenever he needed it. Respondent ultimately wrote 80 unauthorized checks over a period of eight years.

4. SUBMISSION OF FALSE STATEMENTS
During his deposition and while under oath, Respondent submitted false and misleading statements to the People regarding estate funds.

5. VULNERABILITY OF VICTIM
Respondent knowingly took advantage an elderly woman with serious mental and physical infirmities. Respondent misappropriated $148,000 from Ms. Halverson while acting under a court order to protect her interests as conservator of her estate. In addition, Respondent does not believe that his actions caused harm to Mrs. Halverson in the "classic sense." Rather, Respondent testified that he took care of all her financial needs. This view is particularly troubling to the Hearing Board.

6. SUBSTANTIAL EXPERIENCE IN THE PRACTICE OF LAW
Respondent has practiced law for over 36 years. He is and was well aware of his duties as a fiduciary.

C. DUTIES BREACHED
Respondent had a duty to deal professionally, honestly, and openly with Ms. Halverson and her estate. As an officer of the court, he had a duty to render an honest and accurate accounting on the funds entrusted to him as conservator. In addition, he had a duty to promote confidence, not distrust, in our system of justice. Respondent blatantly breached each of these duties.

D. INJURY CAUSED
Respondent unquestionably stole $148,000 from Ms. Halverson's estate. This fact alone demonstrates serious injury. Respondent also caused injury to our system of justice, by obstructing the effective administration of Ms. Halverson's estate.

E. MENTAL STATE
Respondent admits that he acted knowingly when he took Ms. Halverson's money. He was fully aware of his actions and their consequences. Nevertheless, he continued his misconduct for eight years, deceiving his client, the court, and Mr. Dunn in the process. Respondent abused the trust that he knew others placed in him and engaged in a pattern of deceit for his own benefit.

IV. CONCLUSION
Upon consideration of the mitigating and aggravating factors, as well as the duties breached, the injuries caused, and Respondent's mental state, the Hearing Board finds that the gravity of Respondent's conduct substantially outweighs any justification for leniency. To his credit, Respondent has demonstrated *1083 remorse and made full restitution. These mitigating factors, however, are overshadowed by the degree of damage Respondent knowingly caused to his client, to the legal profession, and to our system of justice.
Over an extended period of time, Respondent committed numerous acts of theft against an elderly woman who suffered from physical and mental infirmities. Respondent first stole from Ms. Halverson within one month of his appointment as conservator of her estate. Thereafter, he wrote eighty unauthorized checks to himself and his creditors. As a fiduciary, Respondent was trusted to protect Ms. Halverson and to promote her best interests. Instead, Respondent took advantage of the authority he had over her affairs and converted a large amount of money from her estate for his own personal use.
Under the circumstances of this case, any personal justification for taking the money or intention to repay the funds is rendered irrelevant. Throughout the period in question, Respondent engaged in deceit to conceal his wrongdoing. His dishonesty extended to the point of lying under oath during the OARC's investigation. This case is distinguishable from Fischer, as it involves the actual, intentional, and concealed conversion of substantial funds from a vulnerable client over an extended period of time. 89 P.3d at 820-822.
One of the primary goals of our disciplinary system is to protect the public from lawyers who pose a danger to them. Respondent harmed his client, his colleagues, and our judicial system. On these facts, any sanction short of disbarment would be a disservice to our stated goal of protecting the public. The Hearing Board therefore finds that disbarment is the appropriate sanction.

V. ORDER
It is therefore ORDERED:
1. LAWRENCE C. RIDER, attorney registration 00771, is DISBARRED from the practice of law, effective thirty-one (31) days from the date of this Order, and his name shall be stricken from the roll of attorneys licensed to practice law in the State of Colorado.
2. LAWRENCE C. RIDER is ORDERED to pay the costs of this proceeding; the People shall submit a Statement of Costs within fifteen (15) days of the date of this Order. Respondent shall have ten (10) days in which to respond.