OPINION AND DECISION IMPOSING ) SANCTIONS PURSUANT TO C.R.C.P. 251.19(c)
I. SUMMARY
Respondent engaged in serious misconduct, including the knowing conversion of client funds, which caused his clients substantial injury. Respondent also acted without the requisite competence, failed to adequately communicate with clients, failed to' maintain client and trust account records, and fabricated evidence. This conduct violated Colo. RPC 1.1; Colo. RPC 1.3; Colo. RPC 1.4(a) (2007); Colo. RPC 1.4(b) (2007); Colo. RPC 14(a)(2); Colo. RPC 1.5(b); Colo. RPC 1.5(f); Colo. RPC 1.15(a) (2008); Colo. RPC 1.15(j)(1) and (2) (2008); Colo. RPC 1.16A; Colo. RPC 8.4(a); Colo. RPC 8.4(b); Colo. RPC 4.1(a); and Colo. RPC 8.4(c). Without question, the appropriate sanction is disbarment.
II. PROCEDURAL HISTORY
The People filed their complaint on January 21, 2015. Respondent failed to answer, and the Court granted the People's motion for default on March 17, 2015. Upon the entry of default, the Court deemed all facts set forth in the complaints admitted and all rule violations established by clear and convincing evidence.[1]
At the sanctions hearing on May 26; 2015, the Court admitted exhibits 1-4 and considered the testimony of three of Respondent's clients and the complaining witness in this matter.[2]
III. ESTABLISHED FACTS AND RULE VIOLATIONS
The Court hereby adopts and incorporates by reference the factual background of this case, as fully detailed in the admitted complaint. Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on October 17, 1980, under attorney registration number 10461. He is thus subject to the Court's jurisdiction in these disciplinary proceedings[3]
*1151 Client One and Client Two Matter
Client One and Client Two, who are married, retained Respondent in 2001[4] Pri- or to 2005, Respondent was aware that Client One suffered from Crohn's disease, bipolar disorder, and other ailments.[5] Respondent knew that Client One's bipolar disorder caused ongoing severe financial problems in his marriage, affected his judgment, and caused him at times to be very depressed and lethargic.[6] Respondent was also aware that Client Two had been diagnosed with multiple sclerosis before 2005 and that her condition caused her to suffer from hearing and memory loss.[7]
In 2005, Respondent met with the couple to discuss their ongoing financial difficulties.[8] In December of that year, he talked with them about their need for a conservator.[9] He suggested that rather than institute a conservatorship, he could manage Client One and Client Two's finances.[10] Respondent did not provide his clients with a fee agreement or any written communication stating the basis for his fee.[11] Respondent began managing his clients' money and paying their bills in December 2005.[12] For these services, Respondent initially paid himself a monthly fee of $250.00 from Client One and Client Two's funds.[13] At that time, Client One and Client Two had three sources of income: Client One's monthly private disability payment, Client One's monthly Social Security disability payment, and Client One's part-time job.[14] Client One and Client Two sent théir income to Respondent monthly for him to deposit in his trust account.[15] From December 2005 until April 2018, Respondent kept a handwritten ledger of all bill payments, mortgage payments, and investments he made with his clients' money.[16]
In May 2006, Respondent used $27,700.00 of Client Two's money to purchase stock.[17] He made this purchase in his own name, contrary to Client Two's instructions to purchase the stock in her or her husband's name.[18] Later, in January 2018, Respondent told the couple that the stock had lost money since 2006.[19] Respondent did not pay Client Two the value of the stock.[20] Instead, Respondent liquidated the stock and kept the money.[21]
In January 2007, Respondent began paying himself $400.00 per month from his clients' funds for his financial management services.[22] He never advised his clients of this change.[23] In February 2008, Respondent used Client One and Client Two's funds in his trust account to write himself a $5,600.00 check payable to himself, but he gave his clients no bill or accounting reflecting why he did so.[24]
From May 2008 through May 2018, Respondent failed to keep surplus funds belonging to Client One and Client Two in his trust account, and he therefore converted their funds consistently over a five-year period.[25] During this period, Respondent used a por *1152 tion of his clients' surplus funds for his own personal and business expenses.[26] Also, from at least January 2007 through March 2013, the balance of Respondent's trust account was consistently below the balance that should have been maintained pursuant to Respondent's accounting.[27]
In June 2008, Respondent counseled Client One to execute a deed of trust on the couple's home to CRJ Enterprises, which was a shell corporation created by Respondent.[28] The deed of trust secured a promissory note in the amount of $80,000.00.[29] Respondent never funded the loan, and his clients received no benefit from the deed of trust.[30] Respondent claimed he took this action so that no other banks would loan money against the property to Client One.[31] Later, in October 2018, Respondent counseled an unrelated former client to execute a fraudulent release of the deed of trust.[32] Respondent knew that this client lacked the mental ability to recognize what he was signing.[33] He gave the Arapahoe County Public Trustee the release of deed of trust, knowing it was fraudulent.[34]
In November 2012, Client One and Client Two requested a written audit of Respondent's financial transactions on their behalf.[35] Respondent did not respond.[36] In December 2012, Respondent wrote an email to Client One suggesting that Client One was likely to commit suicide.[37] After Client One and Client Two hired new counsel, Respondent personally transferred his handwritten ledger of expenditures onto his own electronic spreadsheet, and he then destroyed the handwritten ledger.[38] He never gave his clients a copy of the ledger.[39]
After Client One and Client Two retained new counsel, Respondent produced a letter, purportedly dated December 1, 2005, which contains a fee agreement and an explanation of how Respondent would manage the couple's money.[40] In fact, Respondent fabricated this letter in 2012[41] Respondent destroyed Client One and Client Two's entire file without their permission in April 2013.[42]
In this representation, Respondent violated the following Rules of Professional Conduct:
@Colo. RPC 1.1 (a lawyer shall provide competent representation to a client);
® Colo. RPC 1.4(a) (2007) (a lawyer shall, inter alia, promptly comply with reasonable requests for information) and Colo. RPC 14(b) (2007) and Colo. RPC 14(a)(2) (a lawyer shall reasonably consult with a client about the means by which the client's objectives are to be accomplished);
® Colo. RPC 1.5(b) (a lawyer shall communicate, in writing, the rate or basis of the fee and expenses within a reasonable time after commencing representation);
® Colo. RPC 1.5(f) (a lawyer shall not earn fees until the lawyer confers a benefit on the client or performs a legal service);
® Colo. RPC 1.15(a) (2008) (a lawyer shall hold client property separate from the lawyer's own property);
® Colo. RPC 1.15(j)(1) and (2) (2008) (a lawyer in private practice shall maintain trust account records);
©@Colo. RPC 116A (a lawyer in private practice shall retain a client's file unless *1153 the lawyer gives the file to the client, the client authorizes the destruction, or the lawyer has notified the client in writing of the intention to destroy the file);
e Colo. RPC 3.4(a) (a lawyer shall not unlawfully obstruct another party's access to evidence);
e Colo. RPC 3.4(b) (a lawyer shall not falsify evidence);
e Colo. RPC 4.1(a) (a lawyer shall not, in the course of representing a client, knowingly make a false statement of material law or fact to a third person); and
e Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).
Client Three and Complaining Witness Four Matter
On October 18, 2000, Respondent drafted the last will of Don W. Hoffman.[43] Respondent was designated as the personal representative if the first person designated failed to act.[44] Hoffman executed a codicil to his will on April 8, 2004, where he appointed Client Three as the personal representative of his estate.[45] Respondent was listed as the alternate personal representative.[46] Pursuant to the codicil, Hoffman left his residuary estate in thirds to Client Three and two other family members.[47]On February 23, 2011, Hoffman died.[48] At the time of his death, he owed a four-plex property where he had lived with Client Three.[49]
After Hoffman's death, Client Three hired Respondent to take the necessary actions to have Client Three appointed as the personal representative of Hoffman's estate.[50] Client Three began to manage Hoffman's properties on March 2, 2011[51] Respondent advised Client Three that he would get Client Three appointed as the personal representative of the estate so Client Three would have the legal authority to collect rents, evict tenants, and contract for services with regard to the four-plex property.[52] Client Three gave Respondent the contact information for Hoffman's heirs, and Respondent agreed to initiate the probate action on behalf of Client Three.[53]
On March 2, 2011, Client Three paid Respondent a $600.00 retainer.[54] Respondent was aware that Client Three did not have funds for upkeep on the four-plex.[55] At this time, Respondent knew that Hoffman's original will was lost and that Client Three had the original codicil and a copy of the will.[56] Respondent met with Client Three on March 17, 2011, when he told Client Three to continue making mortgage payments and to paint the property.[57] On that day, Client Three paid Respondent an additional $500.00.[58]
Client Three contacted the Denver Probate Court on June 22, 2011, and learned that Respondent had filed no probate action.[59] By June 30, 2011, Client Three had spent $5,177.37 on the property and was in severe financial distress.[60] On July 7, 2011, Respondent filed an "Application for the Informal Probate of the Will and Informal Appointment of Personal Representative." [61] An "Acceptance of Appointment" also was *1154 filed, listing Client Three as the personal representative of Hoffman's estate.[62]
Between April 2011 and December 2011, Client Three attempted to contact Respondent.[63] He received no response.[64] Respondent did not file any other documents in the probate proceeding, failed to take any additional action, and neglected to provide the probate court with Hoffman's heirs' contact information.[65] Respondent never sent Client Three an invoice for his work.[66]
On November 21, 2011, the probate action was cloged due to inactivity.[67]The renters in the four-plex stopped paying rent after Hoffman died.[68] Respondent was aware that Client Three had spent his own money to upkeep the four-plex and that he was owed a reimbursement from Hoffman's estate.[69]
During the course of Respondent's representation, Client Three tried numerous times to contact Respondent, but Respondent did not respond.[70] Client Three was never appointed the personal representative of Hoffman's estate and could not evict tenants or sell the property.[71] Despite having a limited income, Client Three continued to pay the mortgage, utilities, insurance, and taxes on the property using his own money.[72]
Complaining Witness Four ("CWF") lived across the street from the four-plex and was interested in purchasing the property.[73] In June 2013, Client Three gave CWF Respondent's contact information.[74]Respondent told CWF to make a written offer for the property.[75] Respondent then told Client Three to execute a real estate contract to sell CWF the property, even though he knew Client Three was not the personal representative of Hoffman's estate and did not have the authority to sell the four-plex.[76]By doing so, Respondent advised his client to engage in fraudulent activity.[77] Client Three executed the real estate contact based upon Respondent's advice.[78] Thereafter, Respondent failed to respond to telephone calls from CWF and the title insurance company, both asking for evidence of Client Three's appointment as personal representative.[79]
Eventually, Client Three hired a new attorney to reopen the probate matter.[80] In total, Client Three spent $9,413.02 of his own funds to maintain the four-plex.[81] He was never reimbursed from Hoffman's estate.[82]
During his representation of Client Three, Respondent fabricated three documents. He fabricated a letter purportedly dated March 2, 2011, addressed to Client Three and discussing a fee agreement.[83] Client Three never received a fee agreement from Respondent.[84] Respondent also fabricated an invoice purportedly dated April 4, 2011, and a letter dated July 21, 2011.[85] Respondent told the People that he did not save any *1155 computer files or copies of correspondence with Client Three.[86]
In this matter, Respondent violated the following Rules of Professional Conduct:
e Colo. RPC 1.1 (a lawyer shall provide competent representation to a client);
e Colo. RPC 1.3 (a lawyer shall act with reasonable diligence and promptness when representing a client);
e Colo. RPC 1.4(a)(2) (a lawyer shall reasonably consult with a client about the means by which the client's objectives are to be accomplished);
e Colo. RPC 1.5(b) (a lawyer shall communicate, in writing, the rate or basis of the fee and expenses within a reasonable time after commencing representation);
e Colo. RPC 3.4(a) (a lawyer shall not unlawfully obstruct another party's access to evidence);
e Colo. RPC 3.4(b) (a lawyer shall not falsify evidence);
e Colo. RPC 4.1(a) (a lawyer shall not, in the course of representing a client, knowingly make a false statement of material law or fact to a third person); and
e Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation).
IV. SANCTIONS
The American Bar Association Standards for Imposing Lawyer Sanctions (1991 & Supp. 1992) ("ABA Standards ") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[87] When imposing a sanction after a finding of lawyer misconduct, the Court must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.
ABA Standard 3.0-Duty, Mental State, and Injury
Duty: Respondent violated duties he owed to his clients, including failing to provide competent representation, not reasonably communicating with them, and converting client funds. He also violated his duty to the legal system by obstructing access to evidence and falsifying evidence.
Mental State: The Court's order entering default establishes that Respondent knowingly converted client funds and failed to preserve client property.
Injury: The evidence shows that Respondent's actions caused Client One and Client Two significant financial and emotional harm. For instance, Client Two testified at the sanctions hearing that Respondent's misconduct aggravated her multiple sclerosis. Client One testified that he originally trusted Respondent and considered him a friend, but he now feels as though Respondent took advantage of him and his wife because of their disabilities Although the Court is awarding restitution to Client One and Client Two, Respondent's destruction of records and evidence has made it impossible for the Court to identify and award the full amount of restitution due to Client One and Client Two.
In addition, Respondent caused Client Three significant harm. Client Three testified that Respondent's actions caused him considerable stress and that spending $9,413.02 of his own money on the estate was a major financial outlay for him.
ABA Standards 4.0-7.0-Presumptive Sanction
Disbarment is the presumptive sanction for Respondent's misconduct in this case. ABA Standard 4.41 states that disbarment is generally appropriate when a lawyer knowingly converts client property, causing the client injury or potential injury. The Court also takes into account that in cases involving multiple types of attorney misconduct, the ABA Standards recommend that the ultimate sanction should be at least consistent with, and generally greater than, the sane *1156 tion for the most serious disciplinary violation.[88]
ABA Standard 9.0-Aggravating and Mitigating Factors
Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction.[89]
Eight aggravating factors are present here: '
® Respondent has prior discipline.[90]
@ When he converted money and falsified evidence, among other conduct, Respondent had a dishonest and selfish motive.[91]
® Respondent engaged in a pattern of dishonesty.[92]
® Respondent engaged in multiple types of misconduct.[93]
® Respondent submitted false evidence to the People in this disciplinary proceeding.[94]
® Clients One and Two, who had significant disabilities, were vulnerable victims.[95]
® At the time he engaged in this misconduct, Respondent had substantial experience in the practice of law.[96]
® Respondent has demonstrated indifference to paying restitution to his clients."[97]
Because Respondent did not participate in the disciplinary proceedings, the Court is unaware of any mitigating factors.
Analysis Under ABA Standards and Colorado Case Law
The Court is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[98] mindful that "individual cireumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [99] Though prior cases are helpful by way of analogy, the Court is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.
Colorado case law identifies disbarment as the proper sanction when a lawyer knowingly converts client funds, absent significant mitigation [100] Here, given the egregious nature of Respondent's misconduct, the substantial number of aggravating factors and lack of mitigating factors, the relevant Colorado Supreme Court case law, and Respondent's failure to participate in this proceeding, the presumptive sanction of disbarment is clearly warranted.
V. CONCLUSION
Respondent violated his duties to his clients and the legal system by neglecting his clients' cases, converting funds, falsifying evidence, and other misconduct. Given the presumptive sanction and the significant aggravating factors here, Respondent must be disbarred.
VI. ORDER
The Court therefore ORDERS:
*1157 1. JAMES P. DOHERTY, attorney registration number 10461, is DISBARRED. The DISBARMENT SHALL take effect only upon issuance of an "Order and Notice of Disbarment." [101]
2. Respondent SHALL promptly comply with C.R.C.P. 251.28(a-c), concerning winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.
3. Respondent also SHALL file with the Court, within fourteen days of issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the Court setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.
4. The parties MUST file any post-hearing motion or application for stay pending appeal on or before August 6, 2015. No extensions of time will be granted. Any response thereto MUST be filed within seven days, unless otherwise ordered by the Court.
5. Respondent SHALL pay the costs of this proceeding. The People SHALL file a "Statement of Costs" on or before July 30, 2015. Any response thereto MUST be filed within seven days, unless otherwise ordered by the Court.
6. Respondent SHALL pay $17,555.00 in restitution to Client One and Client Two on or before August 6, 2015.
7. The Court SUPPRESSES "Complainant's Witness List."

. See C.R.C.P. 251.15(b); People v. Richards, 748 P.2d 341, 346 (Colo.1987).

. The complaint in this case did not identify these four persons due to the personal and confidential nature of information revealed about them. In addition, Clients 1 and 2 notified the Court at the sanctions hearing that they do not want to be identified by name. The complaint states that the People's report of investigation identified these four persons to Respondent.

. See C.R.C.P.251.1(b). Respondent's registered business address 501 South Fairfax, Denver, Colorado 80246. ‘

. Compl. T1.

. Compl. 12.

.‘ Compl. T1 4, 6, & 9-10.

. Compl. 193, 8.

. Compl. 14.

. Compl. T11.

. Compl.

. Compl. 113.

. Compl. 114.

. Compl. %21.

. Compl.

. Compl. 116.

. Compl. 126.

. Compl. 128.

. Compl. 1% 28-29.

. Compl. 180.

. Compl. 1181.

. Compl. 182.

. Compl. 132.

. Compl. 133.

. Compl. 134.

. Compl. 138.

. Compl. 139.

. Compl. § 64.

. Compl. 1140-41, 45.

. Compl. %141.

. Compl. 142.

. Compl. 149.

. Compl. 173.

. Compl. 177.

. Compl. 178.

. Compl. 155.

. Compl. 56.

. Compl. 152.

. Compl. 1161-62.

. Compl. 163.

. Compl. 184.

. Compl. 187.

. Compl. 1990-91.

. Compl. 192.

. Compl. 194.

. Compl. 195.

. Compl. 196.

. Compl. 197.

. Compl. 198.

. Compl. 199.

. Compl. 1100.

. Compl. 1101.

. Compl. 1102.

. Compl. 1103.

. Compl. 1104.

. Compl. 1105.

. Compl. 1106.

. Compl. "107.

. Compl. 1108.

. Compl. 1109.

. Compl. 1110.

. Compl.

. Compl.1112.

. Compl.

. Compl. 1113.

. Compl. 11° 116-17.

. Compl. 1115.

.) Compl.

. Compl. 1120.

.

. Compl. 1122.

. Compl. €123.

. Compl. TM 124, 126.

. Compl. 1127.

. Compl. 1128.

. Compl. 1129.

. Compl. 1130.

. Compl. %131.

. Compl. 1132. .

. Compl. 1135.

. Compl. 1136.

. Compl. 1137.

. Compl. 1138.

. Compl. €139.

: Compl. T 141.

. Compl. 1140.

. Compl. T9 142-43.

. See In re Roose, 69 P.3d 43, 46-47 (Colo.2003).

. ABA Standards § II at 7.

. See ABA Standards 9.21 & 9.31.

. ABA Standard 9.22(a).

. ABA Standlard 9.22(b).

. ABA _Standard 9.22(c).

. ABA Standard 9.22(d).

. ABA Standard 9.22(B.

. ABA Standard 9.22(h).

. ABA Standard 9.22%).

. ABA Standard 9.22(G).

. See In re Attorney F., 285 P.3d 322, 327 (Colo. 2012); In re Fischer, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

. In re Attorney F., 285 P.3d at 327 (quoting In re Rosen, 198 P.3d 116, 121 (Colo.2008)).

. In re Haines, 177 P.3d 1239, 1250 (Colo. 2008); In re Cleland, 2 P.3d 700, 703 (Colo. 2000).

. In general, an order and notice of disbarment will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In: some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(b), C.R.C.P. 59, or other applicable rules.